In re Herbert M. COLLINS; In
re Uwandolyn Blackwell
Collins, Debtors.

Commonwealth of Virginia; Common-
wealth of Virginia, ex rel City of Nor-
folk; Commonwealth of Virginia, ex
rel Norfolk General District Court,
Plaintiffs–Appellants,

v.

Herbert M. Collins; Uwandolyn
Blackwell Collins, Defendants–
Appellees,

United States of America, Intervenor.

No. 97–1580.

United States Court of Appeals,
Fourth Circuit.

Argued Oct. 26, 1998.

Decided April 5, 1999.

**ARGUED:** Edward Meade Macon, Office of the Attorney General, Richmond, Virginia, for Appellants. Frank James Santoro, Marcus, Santoro, Kozak & Melvin, P.C., Portsmouth, Virginia, for Appellees. Henry Thomas Byron, III, Appellate Staff, Civil Division, United States Department of Justice, Washington, D.C., for Intervenor. **ON BRIEF:** Mark L. Earley, Attorney General of Virginia, Judith W. Jagdmann, Deputy Attorney General, E. Suzanne Darling, Senior Assistant Attorney General/Special Assistant Norfolk Commonwealth's Attorney, Susan W. Atkinson, Assistant Attorney General/Special Assistant Norfolk Commonwealth's Attorney, Office of the Attorney General, Richmond, Virginia; Melvin R. Zimm, Glasser & Glasser, P.L.C., Norfolk, Virginia, for Appellants. Karen M. Crowley, Marcus, Santoro, Kozak & Melvin, P.C., Portsmouth, Virginia, for Appellees. Frank W. Hunger, Assistant Attorney General, Helen F. Fahey, United States Attorney, Mark B. Stern, Appellate Staff, Civil Division, United States Department of Justice, Washington, D.C., for Intervenor.

Before MICHAEL and MOTZ, Circuit Judges, and BOYLE, Chief United States District Judge for the Eastern District of North Carolina, sitting by designation.

Affirmed by published opinion. Judge MICHAEL wrote the opinion, in which Judge DIANA GRIBBON MOTZ and Chief Judge BOYLE joined.

## OPINION

MICHAEL, Circuit Judge:

Herbert Collins was once a bail bondsman in Virginia. He and his wife filed for bankruptcy in 1990 and were released from all of their legally dischargeable debts. Thereafter, the Commonwealth of Virginia sought to collect on pre-bankrupt-

cy judgments entered against Mr. Collins for forfeited bail bonds. Giving notice to the Commonwealth, the Collinses moved to reopen their bankruptcy case for a determination that the bail bond debt was dischargeable. The bankruptcy court held that the debt was discharged, and the district court affirmed. The Commonwealth appeals, asserting for the first time its sovereign immunity under the Eleventh Amendment. We hold (1) that the Eleventh Amendment is not implicated because there was no suit against the Commonwealth and (2) that Mr. Collins's obligation as surety on the forfeited bail bonds is dischargeable in bankruptcy. We therefore affirm.

## I.

In the 1980s Mr. Collins was a (licensed) professional bail bondsman in Norfolk, Virginia. In this capacity Mr. Collins signed as surety on appearance bonds for many defendants in state criminal cases in the Norfolk General District Court. His premium or fee was based on a percentage of the face amount of the bond. Mr. Collins failed to payoff the bonds of some defendants for whom he was surety after they skipped their court appearances. As a result, in the late 1980s the Commonwealth of Virginia, acting on its own behalf and on behalf of the City of Norfolk and the Norfolk General District Court (collectively, the "Commonwealth") obtained judgments against Mr. Collins totaling over $37,000 for these unpaid bond obligations.

On June 20, 1990, Mr. Collins and his wife filed a Chapter 7 bankruptcy petition in the Eastern District of Virginia. Listed on their schedule of unsecured liabilities was a debt of $37,130 to the Commonwealth for the forfeited bail bonds. The Commonwealth received notice of the filing and did not file a proof of claim. (This was a no-asset bankruptcy.) On October 11, 1990, the bankruptcy court entered an order releasing the Collinses "from all dischargeable debts." The Commonwealth

had notice of the discharge and did not object. More than four years later (in February 1995) the Commonwealth, in spite of the discharge order, commenced garnishment proceedings against Mr. Collins to collect on the judgments arising out of his unpaid obligations as surety on forfeited bail bonds.

In August 1996 the Collinses filed a motion to reopen their bankruptcy case for a determination of whether the judgment debt from the bail bonds was dischargeable. Although the Commonwealth was mailed a copy of the motion, it was not named as a defendant in any adversary proceeding or served with process. The Commonwealth filed an objection to the motion to reopen, contending that the debt represented a penalty that was nondischargeable under 11 U.S.C. § 523(a)(7). After a hearing in which the Commonwealth participated, the bankruptcy court (in a single order) granted the motion to reopen and held that the debt was dischargeable. The district court affirmed, and the Commonwealth now appeals to us, raising a new issue. It asserts Eleventh Amendment immunity, arguing that this amendment strips a bankruptcy court of jurisdiction to reopen a case and determine (in conjunction with the decision to reopen) the dischargeability of a debt owed to a state. In the alternative, the Commonwealth continues to argue that a bail bondsman's obligation is nondischargeable in bankruptcy.

Because of the constitutional challenge to federal bankruptcy jurisdiction, we granted the motion of the United States to intervene in this appeal on behalf of the Collinses.

## II.

■ We turn first to the Commonwealth's claim of Eleventh Amendment immunity. The amendment provides, "The Judicial Power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted

against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State." This bar to federal jurisdiction also extends to suits against a state by its own citizens. *Hans v. Louisiana*, 134 U.S. 1, 10, 10 S.Ct. 504, 33 L.Ed. 842 (1890). The Eleventh Amendment thus confirms that each state is a sovereign unit in our federal system and that "it is inherent in the nature of sovereignty not to be amenable to the suit of an individual without [the state's] consent." *Seminole Tribe of Florida v. Florida*, 517 U.S. 44, 54, 116 S.Ct. 1114, 134 L.Ed.2d 252 (1996) (citation omitted).

■ The Commonwealth did not claim sovereign immunity in the bankruptcy or district court, but "the Eleventh Amendment defense sufficiently partakes of the nature of a jurisdictional bar so that it need not be raised in the trial court." *Edelman v. Jordan*, 415 U.S. 651, 677–78, 94 S.Ct. 1347, 39 L.Ed.2d 662 (1974). We will therefore consider the Commonwealth's defense.

We have dealt with the applicability of the Eleventh Amendment to bankruptcy proceedings in two recent cases. The Commonwealth relies on one of the cases, *Schlossberg v. Maryland*, 119 F.3d 1140 (4th Cir.1997), and the Collinses and the United States rely on the other, *Maryland v. Antonelli Creditors' Liquidating Trust*, 123 F.3d 777 (4th Cir.), *cert. denied*, —— U.S. ——, 118 S.Ct. 1517, 140 L.Ed.2d 670 (1997). Because these two cases guide our decision, we will discuss them in some detail.

In *Schlossberg* the bankruptcy trustee filed an adversary proceeding in bankruptcy court against the State of Maryland to avoid as a preference certain income tax payments made by the debtor to the state within 90 days of the filing of the Chapter 7 petition. The state won in the bankrupt-

cy and district courts on its argument that the income tax payment was made in the ordinary course of business. When the trustee appealed to this court, the state contended that it was immune from the trustee's suit under the Eleventh Amendment. In response the trustee argued that 11 U.S.C. § 106, enacted as part of the Bankruptcy Reform Act of 1994, abrogates the immunity of states in several instances, including trustee suits under 11 U.S.C. § 547 to avoid preferential transfers. We began our analysis in *Schlossberg* with the question dictated by the Supreme Court in *Seminole Tribe:* was § 106 of the Bankruptcy Code " 'passed pursuant to a constitutional provision granting Congress the power to abrogate?' " *Schlossberg*, 119 F.3d at 1145 (quoting *Seminole Tribe*, 517 U.S. at 59, 116 S.Ct. 1114). The trustee argued that Congress had the authority to enact § 106 (and thereby abrogate state sovereign immunity) under an Article I power, the Bankruptcy Clause, U.S. Const. art. I, § 8, cl. 4.[1] We disagreed, pointing out that *Seminole Tribe* made clear that the Eleventh Amendment restricts judicial power under Article III. "[T]o give the Eleventh Amendment effect," we said, "Congress' powers under Article I cannot be construed to empower it to expand federal jurisdiction by abrogating the states' sovereign immunities." *Schlossberg*, 119 F.3d at 1145. We therefore held that "Congress has no authority under the Bankruptcy Clause ... to abrogate state sovereign immunity in federal courts." *Id.*

The United States as intervenor in *Schlossberg* asked us to uphold § 106's immunity abolition on another ground, that is, on the authority granted Congress by § 5 of the Fourteenth Amendment. We noted that *Seminole Tribe* acknowledged § 5 of the Fourteenth Amendment as a legitimate source of congressional power to abrogate states' immunities.[2] However,

---

1. The Bankruptcy Clause states, "The Congress shall have Power ... To establish ... uniform laws on the subject of Bankruptcies throughout the United States." U.S. Const. art. I, § 8, cl. 4.

2. The Fourteenth Amendment, which was ratified 70 years after the Eleventh Amendment,

we found "no evidence that Congress either passed [§ 106 of] the Bankruptcy Code under § 5 of the Fourteenth Amendment or sought to preserve the core values specifically enumerated in that amendment." *Schlossberg*, 119 F.3d at 1147. Because Congress could not rely on Article I's Bankruptcy Clause and did not rely on § 5 of the Fourteenth Amendment, we held that the attempt to abrogate the states' Eleventh Amendment immunity through the enactment of § 106 was "unconstitutional and ineffective." *Id.* at 1147. As a result, in the absence of Maryland's consent, the federal courts lacked jurisdiction to entertain the trustee's action against the state to avoid the debtor's preferential tax payment.

In *Antonelli* the State of Maryland[3] claimed that the Eleventh Amendment immunized it from the terms of a Chapter 11 reorganization plan. Under the plan the debtors' real property (about 150 parcels) was transferred into a liquidating trust, the trust marketed the property, and the proceeds were distributed pursuant to the plan. The plan provided that the debtors' transfer of property to the trust and the trust's sales to third parties were to be exempt from state and local transfer taxes pursuant to 11 U.S.C. § 1146(c) (exempting plan transfers from "state stamp or similar tax"). The state, as a creditor, was served with a copy of the proposed plan, and it did not file any objection. Deeds reflecting the transfers from the debtor to the trust and from the trust to third-party purchasers were all recorded with a notation claiming exemption from transfer and recordation taxes. After a year had passed, the state sued the trust and certain of the third-party purchasers to recover transfer and recordation taxes. After the district court rejected the state's claim, it appealed to this court.

On appeal in *Antonelli* the State of Maryland claimed that the Eleventh Amendment barred the bankruptcy court from exercising jurisdiction over a state in a proceeding to confirm a plan of reorganization. Therefore, according to the state, it was not bound by the order confirming the plan. We disagreed for several reasons. First, we noted that the confirmation order was not entered in a suit against the state. The state was not named as a defendant or served with process requiring it to appear in federal court. The situation, we said, was therefore distinguishable from *Schlossberg*, where the state was summonsed to appear upon being sued by the trustee in an adversary proceeding in bankruptcy court. Second, we said that "the power of the bankruptcy court to enter an order confirming a plan ... derives not from jurisdiction over the state or other creditors, but rather from jurisdiction over debtors and their estates." *Antonelli*, 123 F.3d at 787 (citation omitted). Finally, we pointed out that the state, which had notice of the proposed plan, was free either to stay out of court or to submit to federal jurisdiction and challenge the plan:

> It is true that if a state wishes to challenge a bankruptcy court order of which it receives notice, it will have to submit to federal jurisdiction.... The state, of course, well may choose not to appear in federal court. But that choice carries with it the consequence of fore-

---

takes back some of the limitations of the earlier amendment. The Supreme Court in *Seminole Tribe* explained that the Fourteenth Amendment "fundamentally altered the balance of state and federal power struck by the Constitution." *Seminole Tribe*, 517 U.S. at 59, 116 S.Ct. 1114. Section 5 of the Fourteenth Amendment expressly grants Congress the power "to enforce, by appropriate legislation, the provisions of this article." U.S. Const. amend. XIV, § 5. Therefore, "when acting pursuant to § 5 of the Fourteenth Amendment, Congress can abrogate the Eleventh Amendment without the States' consent." *Atascadero State Hosp. v. Scanlon*, 473 U.S. 234, 238, 105 S.Ct. 3142, 87 L.Ed.2d 171 (1985).

**3.** For convenience we use "State of Maryland" or "state" to refer to the State of Maryland and the two Maryland counties involved in *Antonelli*.

going any challenge to the federal court's actions. While forcing a state to make such a choice may not be ideal from the state's perspective, it does not amount to the exercise of federal judicial power to hale a state into federal court against its will and in violation of the Eleventh Amendment. Instead, it is the result of Congress' constitutionally authorized legislative power to make federal courts the exclusive venue for administering the bankruptcy law.

*Id.* at 787. For all of these reasons we held that the Eleventh Amendment did not prevent the bankruptcy court from confirming a plan of reorganization that was binding upon the State of Maryland.

■ We believe that the case now before us is controlled by *Antonelli* and not by *Schlossberg*. The Collinses' motion to reopen was not a suit against the Commonwealth of Virginia, just like the plan confirmation proceeding in *Antonelli* was not a suit against the State of Maryland. In addition, the bankruptcy court here had jurisdiction to determine the dischargeability of a debt to the Commonwealth, just as the court in *Antonelli* had jurisdiction to confirm a plan of reorganization that affected Maryland's rights as a creditor. We will explain in more detail.

■ The Collinses filed a motion to reopen their case under § 350(b) of the Bankruptcy Code. That section allows the bankruptcy court to reopen a case "to accord relief to the debtor, or for other cause." 11 U.S.C. § 350(b). An adversary proceeding, with its compulsory process, is not required to reopen a case because the bankruptcy court's power to reopen flows from its jurisdiction over debtors and their estates. *See Antonelli,* 123 F.3d at 787. A motion to reopen may be filed by "the debtor or other party in interest." Fed. R. Bankr.P. 5010. Here, a copy of the Collinses' motion was served by mail on the Commonwealth. The Commonwealth, however, was not named as a defendant, was not served with process, and was not compelled to appear in bankruptcy court.

The Commonwealth was free to respond to the motion or ignore it. In these circumstances, the motion to reopen was not a suit "against one of the United States" within the meaning of the Eleventh Amendment. *See Antonelli,* 123 F.3d at 787.

The Commonwealth chose to appear in bankruptcy court and oppose the Collinses' motion to reopen on the ground that the bail bond debt was nondischargeable. At that point there was still no suit against the Commonwealth, but there is a question whether the bankruptcy court in determining dischargeability in conjunction with the decision to reopen transformed the proceeding into a suit against Virginia within the meaning of the Eleventh Amendment. We do not believe that the proceeding here ever became a suit "against one of the United States."

■ A federal court's jurisdiction over the dischargeability of debt, just like its jurisdiction to confirm a plan of reorganization, "derives not from jurisdiction over the state or other creditors, but rather from jurisdiction over debtors and their estates." *Antonelli,* 123 F.3d at 787; *see also Gardner v. New Jersey,* 329 U.S. 565, 574, 67 S.Ct. 467, 91 L.Ed. 504 (1947); *Spartan Mills v. Bank of America Illinois,* 112 F.3d 1251, 1255 (4th Cir.), *cert. denied,* — U.S. ——, 118 S.Ct. 417, 139 L.Ed.2d 319 (1997). Once a bankruptcy petition is filed, the bankruptcy court has jurisdiction over the case with authority to resolve all claims against the estate and discharge the debtor, regardless of whether a state is a creditor. *See Gardner v. New Jersey,* 329 U.S. at 572, 67 S.Ct. 467; *International Shoe Co. v. Pinkus,* 278 U.S. 261, 265, 49 S.Ct. 108, 73 L.Ed. 318 (1929).

■ Our bankruptcy system is often described as a collective mechanism for resolving the claims of creditors and relieving the debtor of his legally dischargeable debts. In the traditional case the debtor turns his assets over to a trustee for liquidation and the payment of divi-

dends to creditors according to their statutory priorities. If a state is a creditor, "[b]ankruptcy law modifies the state's collection rights with respect to its claims against the debtor, but it also affords the state an opportunity to share in the collective recovery." *Texas v. Walker*, 142 F.3d 813, 822 (5th Cir.1998), *cert. denied,* —— U.S. ——, 119 S.Ct. 865, 142 L.Ed.2d 768 (1999). Of course, if the state wishes to participate in the recovery, it must file a proof of claim in bankruptcy court. It has long been held that when a state is a creditor, bankruptcy procedure for proof and allowance of claims does not operate as a suit against the state in violation of the Eleventh Amendment. Nothing compels the state to submit to the jurisdiction of the federal bankruptcy court, and the court's power to allow or deny a state's claim derives from the court's jurisdiction over the bankruptcy estate. In short, if a state wishes to share in the estate, it must submit to federal jurisdiction. *New York v. Irving Trust Co.*, 288 U.S. 329, 333, 53 S.Ct. 389, 77 L.Ed. 815 (1933) ("The federal government possesses supreme power in respect of bankruptcies. If a state desires to participate in the assets of a bankrupt, she must submit to appropriate requirements by the controlling power ...."); *Texas v. Walker*, 142 F.3d at 822 ("Bankruptcy operates by virtue of the Supremacy Clause and without forcing the state to submit to suit in federal court.").

■ While the bankruptcy system gives creditors an opportunity to share in the estate, the debtor receives an overriding benefit. In return for submitting to the bankruptcy process, the debtor is discharged of his legally dischargeable debts. Even though the debtor (like the Collinses) has no assets to hand over, he is still entitled to a discharge order. The discharge order clears all dischargeable debts, including those owed to a state. Although this alters the state's legal rights, the discharge order is not entered in a suit against the state. The order does not depend on bankruptcy court jurisdiction over the state; as we have indicated, it is based on the court's jurisdiction over the debtor and his estate. *See id.* at 823 ("the granting of a bankruptcy discharge does not offend the Eleventh Amendment"); *Antonelli,* 123 F.3d at 787.

The power of bankruptcy courts to discharge debt is fundamental to our bankruptcy system. If a state could assert Eleventh Amendment immunity to avoid the effect of a discharge order, the bankruptcy system would be seriously undermined. A person owing debts to a state could never have those debts discharged by a bankruptcy court unless the state agreed. Debtors owing money to states could not be assured of the opportunity for a "fresh start" heretofore guaranteed by the bankruptcy laws. As the Supreme Court has said, the purpose of the bankruptcy laws is to "give[ ] to the honest but unfortunate debtor ... a new opportunity in life and a clear field for future effort, unhampered by the pressure and discouragement of pre-existing debt." *Local Loan Co. v. Hunt*, 292 U.S. 234, 244, 54 S.Ct. 695, 78 L.Ed. 1230 (1934). This purpose can be fulfilled today only if the bankruptcy courts retain the power to discharge debts, including debts owed to states, consistent with established federal supremacy with respect to bankruptcy. *See Irving Trust Co.*, 288 U.S. at 333, 53 S.Ct. 389; *Antonelli,* 123 F.3d at 787.

The Commonwealth argues that these basic principles are beside the point in the Collinses' case. According to the Commonwealth, when the bankruptcy court determined dischargeability in conjunction with the motion to reopen, it transformed the case into an adversary proceeding against the Commonwealth in violation of the Eleventh Amendment. We disagree. This was not an adversary proceeding because there was no action to compel the Commonwealth to come into court. The court did not issue any process summonsing the Commonwealth to appear. While the Commonwealth was served with notice of the motion to reopen, it was free to stay

away from bankruptcy court or to appear for the hearing. We recognize that this put the Commonwealth in a tough spot. It could decline to appear and thereby forego the opportunity to make its argument and challenge any decision. On the other hand, it could voluntarily submit to federal jurisdiction and take part in the proceedings. Forcing the Commonwealth to make such a choice "does not amount to the exercise of federal judicial power to hale a state into federal court against its will and in violation of the Eleventh Amendment." *Antonelli,* 123 F.3d at 787. Again, the Commonwealth was not summonsed to appear in the proceedings brought on by the Collinses' motion to reopen. Moreover, the bankruptcy court did not need to assert jurisdiction over the Commonwealth to determine the dischargeability of the bail bond debt in conjunction with its decision to reopen. The court had the power to do that because it had jurisdiction over the debtors and their case. *See Texas v. Walker,* 142 F.3d at 822 (noting that a bankruptcy case cannot be "equat[ed] ... with a suit against the state"); *Antonelli* 123 F.3d at 787. The Eleventh Amendment was not implicated.

### III.

We now consider whether Mr. Collins's suretyship obligation on the bail bonds is dischargeable in bankruptcy. Section 523 of the Bankruptcy Code provides that a discharge does not release an individual debtor from any debt "to the extent such debt is for a fine, penalty, or forfeiture payable to and for the benefit of a governmental unit, and is not compensation for actual pecuniary loss." 11 U.S.C. § 523(a)(7). We believe that Mr. Collins's debt for the bail bonds is not a "fine, penalty, or forfeiture" within the meaning of Section 523(a)(7). Therefore, this debt is dischargeable in bankruptcy.

Bankruptcy courts that have considered the dischargeability of bail bond debts have reached different conclusions. Some courts have held that these debts are dis-

chargeable in bankruptcy, finding them more akin to a contractual obligation than a "penalty" or "forfeiture." *See In re Damore,* 195 B.R. 40 (Bankr.E.D.Pa.1996); *In re Midkiff,* 86 B.R. 239 (Bankr.D.Colo. 1988); *In re Paige,* No. 86 B 8072 C, 1988 WL 62500 (Bankr.D.Colo. Apr.15, 1988). Other courts have held that the debts are not dischargeable, citing concerns about the effective functioning of the bail system. *See In re Scott,* 106 B.R. 698, 701 (Bankr. S.D.Ala.1989) (noting that discharge would "thwart the public welfare objectives served by the state's [garnishment] action"); *In re Bean,* 66 B.R. 454, 457 (Bankr.D.Colo.1986) ("this entire system could be undermined or destroyed if those persons who post appearance bonds may simply discharge their obligations under the protection of the Bankruptcy Code").

The nondischargeable "fine, penalty, or forfeiture" under § 523(a)(7) is an obligation that is essentially penal in nature. The Supreme Court has described this provision as "creat[ing] a broad exception for all *penal* sanctions, whether they be denominated fines, penalties, or forfeitures." *Kelly v. Robinson,* 479 U.S. 36, 51, 107 S.Ct. 353, 93 L.Ed.2d 216 (1986) (emphasis added). In *Kelly v. Robinson* the Court held that restitution ordered by a court as part of a criminal sentence is nondischargeable under § 527(a)(7), noting that "the decision to impose restitution does not turn on the victim's injury, but on the penal goals of the State and the situation of the defendant." *Id.* at 52. It went on to explain that "[u]nlike an obligation which arises out of a contractual, statutory or common law duty, here the obligation is rooted in the traditional responsibility of a state to protect its citizens by enforcing its criminal statutes and to rehabilitate an offender by imposing a criminal sanction intended for that purpose." *Id.* (quoting *In re Pellegrino,* 42 B.R. 129, 133 (Bankr. D.Conn.1984)). We applied this same reasoning in *Thompson v. Virginia,* 16 F.3d 576 (4th Cir.1994), when we held that court costs assessed against a criminal defen-

dant upon conviction are nondischargeable in bankruptcy. We explained that "the assessment of costs is understood by the Commonwealth as operating hand-in-hand with the penal and sentencing goals of the criminal justice system. The practical operation of the cost-assessment can only be understood in the penal context." *Id.* at 580. These cases, *Kelly v. Robinson* and *Thompson v. Virginia*, confirm that a sanction must be penal to be exempt from discharge under § 523(a)(7). This view is consistent with the intent of the drafters of the Bankruptcy Code, who said, "The bankruptcy laws are not a haven for criminal offenders, but are designed to give relief from financial over extension." H.R.Rep. No. 95–595, at 342 (1978), reprinted in 1978 U.S.C.C.A.N. 5787, 6299.

■ The relevant question then is whether Mr. Collins's debt for the unpaid bail bonds is penal in nature. We believe it is not. Under Virginia law surety bonds posted by professional sureties are contractual obligations, subject to the general rules of contract law. *Board of Supervisors v. Safeco Ins. Co.*, 226 Va. 329, 336, 310 S.E.2d 445, 449 (1983). Mr. Collins was licensed by the Commonwealth as a professional bail bondsman (or surety). Under this authority he executed appearance bonds for criminal defendants in exchange for premiums. He voluntarily assumed the role of surety for his principals by means of a contractual obligation to the Commonwealth. As the Seventh Circuit has said, "[t]he bond is a contract between the surety and the government that if the latter will release the principal from custody the surety will undertake that the principal will appear personally at any specified time and place to answer." *United States v. Davis*, 202 F.2d 621, 625 (7th Cir.1953). Mr. Collins's debts to the Commonwealth arose when certain of his principals failed to show up for trial or other proceedings. What the bankruptcy court

said in *In re Paige* describes the nature of Mr. Collins's debts: "It cannot be said that [he] was being punished by virtue of incurring these [bail bond] obligations. [He] committed no criminal or penal act which gave rise to such debts. These bail bond forfeiture obligations, as to [him], arose from a purely financial and contractual arrangement." 1988 WL 62500, at *4.[4] When the bondsman incurs liability for the full amount of bail upon his principal's failure to appear in criminal court, we refer to this colloquially as "forfeiting" the bond. It does not matter, however, that § 523(a)(7) includes the term "forfeiture" in its list of nondischargeable debts; this section, as we have said, excludes from bankruptcy discharge only debts that are essentially penal in nature. From the standpoint of the bondsman, the "forfeiture" of a bail bond is more akin to triggering liquidated damages for breach of his contract with the state than it is to triggering a penal sanction against him. Indeed, losses on bail bonds when criminal defendants abscond are an inevitable cost of doing business for the professional bondsman. We therefore conclude that Mr. Collins's bail bond debt arose from a contractual obligation and was not a "fine, penalty, or forfeiture" within the meaning of § 523(a)(7).

The Commonwealth expresses concern that its bail system will be undermined if bondsmen may discharge their bond obligations in bankruptcy. We are sensitive to this concern, but we do not believe that we are creating a problem. Virginia law subjects bail bondsmen to heavy regulation. *See* Va.Code Ann. § 19.2–152.1 (Michie 1950). Before an applicant can be licensed as a professional bail bondsman, a local circuit judge must certify that he is suitable to engage in that business. Thereafter, there are a number of steps the Commonwealth can take to ensure that

---

4. Although we hold that the bail bond obligations of a professional bondsman are dischargeable, the criminal defendant himself is not entitled to a discharge on his bail bond forfeiture. As far as the defendant is concerned, the forfeiture amounts to a penalty imposed on him for his failure to appear in court. *See In re Paige*, 1988 WL 62500, at *4.

a particular bondsman's bail bonds are adequately collateralized. For example, he may be required to execute a deed of trust on his real estate in favor of the Commonwealth to secure the expected limit of his bond obligations. Or, he may be required to place a sufficient amount of cash or negotiable instruments in escrow with the clerk of court. Bondsmen licensed after July 1, 1989, must automatically provide $200,000 in collateral. There is a mechanism for the Commonwealth to monitor the individual bondsman's obligations: each month the bondsman must file with the clerk a list of his outstanding bonds with their amounts noted. *See id.* In short, there are sufficient safeguards available for the Commonwealth to ensure that its bail bondsmen are financially sound and that they provide adequate security to cover any default. We are therefore satisfied that our holding will not place Virginia's bail system in jeopardy.

We hold that the judgments against Herbert Collins for his unpaid suretyship obligations on bail bonds are dischargeable in bankruptcy.[5]

### IV.

The judgment of the district court is affirmed.

*AFFIRMED.*

---

**5.** The United States suggests that state officials may be enjoined under the doctrine of *Ex parte Young,* 209 U.S. 123, 28 S.Ct. 441, 52 L.Ed. 714 (1908), from taking action to collect a debt in violation of a bankruptcy court's discharge order. That issue is not before us today.