In re Christine Phelan
PHELPS, Debtor.

Christine Phelan Phelps, Plaintiff,

v.

Sallie Mae Loan Service Center and New York State Higher Education Services Corporation, Defendants.

Bankruptcy No. 94–11928.
Adversary No. 94–1184.

United States Bankruptcy Court,
D. Rhode Island.

July 14, 1999.

See also 180 B.R. 27.

Jason Monzack, Kirshenbaum & Kirshenbaum, Cranston, Rhode Island, for debtor/plaintiff.

John N. Taylor, Jr., Providence, Rhode Island, for defendant, New York State Higher Education Services Corporation.

*DECISION AND ORDER*

ARTHUR N. VOTOLATO, Bankruptcy Judge.

On appeal, this Court's January 28, 1998, bench decision and order was re-

manded by the United States Bankruptcy Appellate Panel, with instructions to: (1) determine whether Sallie Mae Loan Service Center/New York State Higher Education Services Corporation[1] is entitled to the protection of the Eleventh Amendment; and (2) develop a factual record and make conclusions of law. *See Phelps v. New York State Higher Educ. Servs. Corp. (In re Phelps)*, BAP No. RI–98–015 (1st Cir. BAP October 8, 1998). We comply, as follows. The matter before the BAP was the appeal by HESC of our order determining the student loan obligation of Christine Phelps to be discharged, pursuant to 11 U.S.C. § 523(a)(8), based on undue hardship.

### BACKGROUND/TRAVEL

Five years ago, on August 16, 1994, Phelps filed a Chapter 7 petition listing student loan obligations to HEMAR Insurance Corporation of America ("HEMAR") and Sallie Mae/HESC. On the same date, she filed adversary proceedings to have the education loans declared dischargeable on account of hardship under 11 U.S.C. § 523(a)(8). In February 1995, the Complaint against HEMAR was heard and on March 17, 1995, the debt was determined to be nondischargeable. However, as is our common practice in these cases, the matter was scheduled for review in one year to reassess the Debtor's financial condition. *Phelps v. Hemar Ins. Corp. of America (In re Phelps)*, 180 B.R. 27 (Bankr.D.R.I.1995). At that time, Phelps was a thirty-six year old single parent living with her infant son in a luxury apartment. *Id.* at 27. She held a bachelor's degree in English Literature, had completed three semesters of law school and had paralegal experience, and in general had a bright future. *Id.* at 27–28. She had recently started work at Fleet Investment Services at an annual salary of $24,000, *id.,* and was receiving $50 per week in child support from her ex-hus-

band, who is an attorney. *Id.* Based upon the evidence at that time, we found that Ms. Phelps' tight budget was self-imposed—the result of a self-indulgent lifestyle and excessive living expenses. *Id.* She explained that some of the apparent extravagance was being subsidized by her parents, but that was about to end shortly. *Id.* at 28. We found Ms. Phelps to be an articulate, intelligent young woman, whose temporary financial stress was of her own doing, *id.,* and denied her request to discharge over $22,000 in educational loans to HEMAR. The matter was set for a status conference in one year to assess her financial condition, as well as that of her ex-husband, vis-a-vis family court ordered support obligations. *Id.*

On September 18, 1995, the Debtor's Complaint against Sallie Mae/HESC was heard on the merits by Bankruptcy Judge James Yacos, District of New Hampshire, sitting by designation. Judge Yacos found that the Debtor's financial condition had not improved since the entry of our March 17, 1995, Decision and Order in the HEMAR adversary proceeding, and found that the Debtor had no ability to make payments to Sallie Mae/HESC. *See* Docket No. 20, Order of September 22, 1995. Judge Yacos did not rule on whether the debt to Sallie Mae/HESC was dischargeable, but ordered that the matter be reviewed at the same time as the next HEMAR review.

On December 11, 1996, there was a status hearing in both the HEMAR and Sallie Mae/HESC adversary proceedings, prior to which the Debtor filed an affidavit as to her financial condition, as well as answers to interrogatories propounded by Sallie Mae/HESC. Phelps also testified that her financial condition had indeed changed, for the worse, and that when she stopped receiving financial assistance from her parents she moved into much less expensive quarters. Her ex-husband's financial condition had also deteriorated, and child sup-

---

1. Sallie Mae is the servicing agent for New York State Higher Education Services Corpo-

ration. We will refer to these parties as "Sallie Mae/HESC" or HESC.

port payments were reduced to $25 per week by the Family Court. The Debtor also testified that state aid to her infant son for food and medical care was terminated, resulting in a net loss in funds available to the Debtor and her son for food and medical expenses. At that time (December 1996), virtually all of the Debtor's income was being used for no-frills living expenses, and our prior concern over excessive spending was no longer an issue. In fact, based on her worsening financial condition, the $40 per month payment to HEMAR mandated in our March 1995 Decision and Order was suspended. We *again* set the matter for a status report in one year to assess the Debtor's financial condition, specifically with respect to: (1) her employment with Fleet Financial Services; (2) child support—both present and accruing obligations; and (3) the status of a class action suit in which the Debtor is a member.

*The Hearing That Led to the Appeal and Remand*

On January 28, 1998, at the continued status hearing in both adversary proceedings, Sallie Mae/HESC insisted on a final determination *on that day*[2] as to whether its student loan obligations were dischargeable. We granted Sallie Mae/HESC's request and, with the Debtor's consent, held an evidentiary hearing on the merits of the complaint. Wisely, HEMAR opted not to participate, and agreed that its presence was for purposes of the status review only.

The Debtor testified that little had changed since her last appearance before the Court in December 1996, except the following:

(1) She had received a minor raise of $550 per year from Fleet;

(2) Her son had just turned five, he was eating more, and that her food bill had increased by $40–80 per month;

(3) She spends $5 more per month on clothing for her son;

(4) Daycare expenses had doubled, to $40 per month;

(5) She amended her withholdings at work to increase her take home pay, and will likely face an income tax liability;

(6) The Debtor's ex-husband was paying support of $25 per week, but accruing $86 per week in arrearages, was "marginally" practicing law from a room in a boarding house in Massachusetts, and has never made payments on accrued support obligations.

(7) Settlement talks were ongoing in the class action litigation in which the Debtor is a plaintiff, that the negotiations involved payment first of medical expenses for individuals who manifested physical problems and/or illness, and that the first money would be dedicated to necessary surgical corrections. Because the Debtor has not had adverse effects to date, she believes that any payment to her will be late in the distribution scheme and probably will not be substantial.

(8) The Debtor was unable to pay the City of Providence property tax bill on her automobile.

The Debtor's testimony was the only evidence presented, and immediately after the arguments we ruled that under 11 U.S.C. § 523(a)(8)(B), the debt to Sallie Mae/HESC was discharged.[3] In ruling from the bench we stated, *inter alia*, that:

[T]his Court in most cases is fairly severe with debtors, and we certainly have not treated this one any easier as far as imposing the student loan dis-

2. Paraphrasing, Sallie Mae had had quite enough of the Court's over-indulgence of this Debtor, and wanted relief in the matter, *now*. If Sallie Mae could have chosen a worse time to obtain a ruling on the merits of this dispute, we cannot imagine when that would have been. Debtor's counsel likely recog- nized this, as he voiced no objection to an immediate hearing on the merits.

3. The Adversary Proceeding against HEMAR was continued, with the consent of HEMAR, for status review to January 27, 1999.

chargeability requirements. The petition was filed in 1994. She's been making repeated visits back to the Court reporting as to her financial condition, her progress if you want to call it that.

The original order entered by the Court I think was justified at the time. The debtor was living in a luxury apartment, almost $1,000 a month for rent, spending $100 a month on telephone. The same for travel, 450 for food—and these are in 1994 dollars. So that at that time I thought that they were excessive for someone in the debtor's circumstances, and we made adequate provision for protecting the creditors' rights.

This morning, the more times we come back and the less progress made financially—it seems as though the debtor's former husband is certainly not going to be somebody that can reasonably be expected to pull this case out, either for the debtor or her child or her creditors. I didn't know that in 1994, but it becomes more apparent as each day goes by what kind of source of support he would be.

The one question mark that's still out there is the class action lawsuit. We don't know—I think it's—the information is pretty vague about what we have, and I agree that that—again, treating this case severely as we do with the student loan cases that come before the court—I know that many other courts follow much less stringent standards and grant discharges much more readily than we do . . . .

The facts present this morning call for a granting of the Debtor's request for hardship discharge, and it's so ordered. *See* A.P. No. 94–1184, Transcript of Hearing held on January 28, 1998, pp. 32–34.

On February 26, 1998, Sallie Mae/HESC filed a notice of appeal of the bench decision and order finding its debt dischargeable, and for the first time in this litigation raised the issue of sovereign immunity under the Eleventh Amendment, based on the United States Supreme Court decision in *Seminole Tribe v. Florida*, 517 U.S. 44, 116 S.Ct. 1114, 134 L.Ed.2d 252 (1996). On October 8, 1998, the Bankruptcy Appellate Panel for the First Circuit vacated the decision and remanded the order, directing the bankruptcy court to: (1) determine whether New York State Higher Education Services Corporation is an entity entitled to the protections of the Eleventh Amendment; and (2) develop a factual record and reach conclusions of law "upon which a review could be made intelligently and efficiently on appeal." *See Phelps v. New York State Higher Educ. Servs. Corp. (In re Phelps)*, BAP No. RI–98–015, slip op. at 2 (1st Cir. BAP October 8, 1998).

On November 4, 1998, at a conference following the BAP remand order, the parties indicated that no further evidentiary hearing was necessary, and that they would submit a Joint Pre–Trial Order setting forth the agreed facts and disputed issues. See Docket No. 41.

## DISCUSSION

HESC argues that the Eleventh (sovereign immunity) Amendment of the Constitution protects it from suit by a private party in federal court, and that Congress's attempt to abrogate sovereign immunity in 11 U.S.C. § 106(a), as amended by the Bankruptcy Reform Act of 1994, Pub.L. 103–394 (Oct. 22, 1994), was an invalid exercise of power and therefore unconstitutional and ineffective. *See Seminole Tribe*, 517 U.S. at 72–74, 116 S.Ct. 1114. The Debtor, in opposition, argues that HESC long ago waived any immunity in this case, and has expressly consented to Federal Court jurisdiction.

The Eleventh Amendment says: "The Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State." U.S.

Const. amend. XI. Neither party has addressed the threshold issue—whether HESC is an entity entitled to the protection of the Eleventh Amendment. In this regard, the Debtor has not provided information regarding the structure of HESC to assist in making that determination. So for the purpose of this decision and to shorten the list of issues on appeal, we will assume that HESC is entitled to Eleventh Amendment protection.

Turning to the abrogation issue, Section 106(a) states that:

(a) Notwithstanding an assertion of sovereign immunity, sovereign immunity is abrogated as to a governmental unit to the extent set forth in this section with respect to the following:

(1) Sections 105, 106, ... 523, ... of this title.

(2) The court may hear and determine any issue arising with respect to the application of such sections to governmental units.

(3) The court may issue against a governmental unit an order, process, or judgment under such sections or the Federal Rules of Bankruptcy Procedure, including an order or judgment awarding a money recovery, but not including an award of punitive damages....

. . .

(5) Nothing in this section shall create any substantive claim for relief or cause of action not otherwise existing under this title, the Federal Rules of Bankruptcy Procedure, or non-bankruptcy law.

11 U.S.C. § 106(a). While it would be an interesting and challenging exercise, there is no need to resolve whether this statute is constitutional. Assuming arguendo that HESC is entitled to Eleventh Amendment protection, which has not been abrogated by § 106(a), we conclude that in this case, HESC has waived any such sovereign immunity.

The Supreme Court has consistently held that "[i]n deciding whether a State has waived its constitutional protection under the Eleventh Amendment we will find waiver only where stated 'by the most express language or by such overwhelming implications from the text as (will) leave no room for any other reasonable construction.' " *Edelman v. Jordan,* 415 U.S. 651, 673, 94 S.Ct. 1347, 39 L.Ed.2d 662 (1974), *quoting, Murray v. Wilson Distilling Co.,* 213 U.S. 151, 171, 29 S.Ct. 458, 53 L.Ed. 742 (1909). A waiver of constitutional immunity may be effectuated by state statute or constitutional provision, or by otherwise waiving immunity within the context of a given federal program. *See Atascadero State Hosp. v. Scanlon,* 473 U.S. 234, 238 n. 1, 105 S.Ct. 3142, 87 L.Ed.2d 171 (1985). "In each of these situations, we require an unequivocal indication that the State intends to consent to federal jurisdiction that otherwise would be barred by the Eleventh Amendment.... 'Constructive consent is not a doctrine commonly associated with the surrender of constitutional rights....' " *Id. (quoting Edelman v. Jordan,* 415 U.S. 651, 673, 94 S.Ct. 1347, 39 L.Ed.2d 662 (1974)).

Notwithstanding all of these caveats and protections against casual or unintended waiver, it is very clear that HESC has done whatever it takes, *and more,* to waive immunity. On August 16, 1994, when the Debtor filed her Complaint, the only named defendant was Sallie Mae Loan Service Center. *See* A.P. No. 94–1194, Docket No. 1, Complaint. HESC was not served with the Complaint, and was not a party to the adversary proceeding. On September 9, 1994, counsel for HESC sent a letter to Debtor's counsel, with a copy to the Court, pointing out that because HESC was not a named party nor served with the Complaint, HESC would not be bound by any Court order. *See* A.P. No. 94–1194, Docket No. 4, Letter dated September 9, 1994. Counsel went on to say, however, that "we would be

willing to appear as a party-defendant by stipulation." *See* Id. On October 25, 1994, HESC and the Debtor filed this stipulation: "New York Higher Education Services Corporation (hereinafter referred to as 'NYSHESC') is hereby added as a party defendant and NYSHESC may have until November 14, 1994 to file its answer." *See* A.P. No. 94–1194, Docket No. 5, Stipulation dated October 12, 1994. On November 2, 1994, HESC filed its answer acknowledging: (1) that HESC was a party to this adversary proceeding; (2) that this Court has jurisdiction; and (3) that this is a core proceeding under 28 U.S.C. § 157. *See* A.P. No. 94–1194, Docket No. 7, Answer.

It would be difficult to envision a clearer case. Clearly, HESC wanted to be before this Court, and indeed asked to be before this Court. Furthermore, at the January 28, 1998 status conference it was at HESC's vehement insistence that a hearing on the merits of the Debtor's Complaint be held, and that it receive a final ruling on the dischargeability of its debt. It was only after an unfavorable decision on the merits that HESC raised the Eleventh Amendment issue. It is hard to imagine what else HESC could have done to establish its consent to federal jurisdiction in this Court, and it is just as inconceivable to this Court that the Eleventh Amendment could have been intended to release an aggrieved party from an unfavorable decision *after* it has so unequivocally consented to jurisdiction. While it is not a basis for this decision, HESC's actions should preclude its belated immunity argument, by estoppel.

█ Alternatively, in the event of further appeals in this matter, we would agree with and adopt the holding of the Fourth Circuit Court of Appeals in *Commonwealth of Virginia v. Collins* (*In re Collins*), 173 F.3d 924 (4th Cir.1999), which held that a bankruptcy court's ability to determine the dischargeability of a debt owed to a sovereign stems, not from jurisdiction over the sovereign, but from

the bankruptcy court's jurisdiction over the debtors and the estate. In *Collins,* the City of Norfolk obtained a judgment against a bail bondsman (Collins) for over $37,000. Collins and his wife filed a Chapter 7 petition, obtained their discharge(s), and the case was closed. Notwithstanding the discharge, the Commonwealth of Virginia commenced garnishment proceedings to collect on its judgment. Collins moved to reopen the bankruptcy case for a determination that the debt was dischargeable. The bankruptcy court found the debt to be dischargeable, and the district court affirmed. On appeal to the Fourth Circuit Court of Appeals, the Commonwealth for the first time raised the defense of sovereign immunity. The court of appeals stated:

> Here, a copy of the Collinses' motion was served by mail on the Commonwealth. The Commonwealth, however, was not named as a defendant, was not served with process, and was not compelled to appear in bankruptcy court. The Commonwealth was free to respond to the motion or ignore it. In these circumstances, the motion to reopen was not a suit "against one of the United States" within the meaning of the Eleventh Amendment. *See [Maryland v.] Antonelli [Creditors' Liquidating Trust],* 123 F.3d [777] at 787 [ (4th Cir.) ].

The Commonwealth chose to appear in bankruptcy court and oppose the Collinses' motion to reopen on the ground that the bail bond debt was nondischargeable. . . .

A federal court's jurisdiction over the dischargeability of debt, just like its jurisdiction to confirm a plan of reorganization, "derives not from jurisdiction over the state or other creditors, but rather from jurisdiction over debtors and their estates." *Antonelli,* 123 F.3d at 787; *see also Gardner v. New Jersey,* 329 U.S. 565, 574, 67 S.Ct. 467, 91 L.Ed. 504 (1947); *Spartan Mills v. Bank of Amer-*

*ica Illinois,* 112 F.3d 1251, 1255 (4th Cir.), *cert. denied,* — U.S. —, 118 S.Ct. 417, 139 L.Ed.2d 319 (1997). Once a bankruptcy petition is filed, the bankruptcy court has jurisdiction over the case with authority to resolve all claims against the estate and discharge the debtor, regardless of whether a state is a creditor. *See Gardner v. New Jersey,* 329 U.S. at 572, 67 S.Ct. 467; *International Shoe Co. v. Pinkus,* 278 U.S. 261, 265, 49 S.Ct. 108, 73 L.Ed. 318 (1929).

. . . .

Nothing compels the state to submit to the jurisdiction of the federal bankruptcy court, and the court's power to allow or deny a state's claim derives from the court's jurisdiction over the bankruptcy estate. In short, if a state wishes to share in the estate, it must submit to federal jurisdiction. *New York v. Irving Trust Co.,* 288 U.S. 329, 333, 53 S.Ct. 389, 77 L.Ed. 815 (1933).

*Collins,* 173 F.3d at 929–930.

Similarly to the Commonwealth of Virginia in *Collins,* HESC was not summoned to appear before this Court, it was not served with process, yet chose to appear and defend because of a monetary interest it wished to protect. Requiring HESC to make such a choice does not equate to forcing HESC to litigate in federal court in violation of the Eleventh Amendment.

As for the substantive question whether the debt to Sallie Mae/HESC is dischargeable under 11 U.S.C. § 523(a)(8), we begin with our analysis of the statute, which provides:

(a) A discharge under section 727 . . . of this title does not discharge an individual debtor from any debt—

. . .

(8) for an educational benefit overpayment or loan made, insured or guaranteed by a governmental unit, or made under any program funded in whole or in part by a governmental unit or nonprofit institution, or for an obligation to repay funds received as an educational benefit, scholarship or stipend, unless excepting such debt from discharge under this paragraph will impose an undue hardship on the debtor and the debtor's dependents.

11 U.S.C. § 523(a)(8) (1998) (West).[4] In determining undue hardship, many bankruptcy courts have followed the Second Circuit Court of Appeals in *Brunner v. New York State Higher Educ. Servs. Corp.,* 831 F.2d 395 (2nd Cir.1987), which applies the following three-part test: (1) based on current income and expenses the debtor cannot maintain a "minimal" standard of living for him/herself and dependents, if required to repay the loans; (2) this state of financial affairs is likely to persist for a significant portion of the repayment period; and (3) the debtor has made good faith efforts to repay the loans. *Brunner,* 831 F.2d at 396.

Other courts have used a totality of circumstances approach to determine undue hardship. In *Law v. Educational Resources Inst. Inc. (In re Law),* 159 B.R. 287, 292–293 (Bankr.S.D.1993), the bankruptcy court opted for a "case-by-case approach that is fact sensitive" and considers a debtor's income and expenses, good faith, and any other relevant circumstances. The court explained that a totality of the circumstances test "affords a determination that contextually considers

---

**4.** This Section, amended by the Higher Education Amendments of 1998, eliminates section 523(a)(8)(A) which provided for the discharge of student loans if they had been in repayment for more than seven years. *See* H.R.Conf.Rep. No. 750, 105th Cong., 2d Sess. (1998). While the Debtor's Complaint requests that the loans in question be discharged under the prior version of the statute (523(a)(2)(A)) because they have been in repayment for more than seven years, the Debtor has presented no proof on the issue. Accordingly, any relief requested under prior Code Section 523(a)(8)(A) is denied, and this discussion will focus only on the current Section 523(a)(8) which remains substantially unchanged from the prior version codified in Section 523(a)(8)(B). *See* H.R.Conf.Rep. No. 750, 105th Cong., 2d Sess. (1998).

both the debtor's situation and the policies underlying § 523(a)(8)" and "ensures an appropriate, equitable balance [between] concern for cases involving extreme abuse and concern for the overall fresh start policy." *Id.*

■ In endorsing a totality of the circumstances approach, the Bankruptcy Appellate Panel for the Eighth Circuit recently stated that the test for undue hardship requires "an analysis of (1) the debtor's past, present, and reasonably reliable future financial resources; (2) calculation of the debtor's and his dependents' reasonable necessary living expenses; and (3) any other relevant facts and circumstances surrounding that particular bankruptcy case." *Andresen v. Nebraska Student Loan Program Inc.* (*In re Andresen* ), 232 B.R. 127, 140 (8th Cir. BAP 1999), *citing, Andrews v. South Dakota Student Loan Assistance Corp.* (*In re Andrews* ), 661 F.2d 702, 704 (8th Cir.1981). Although the Debtor would be entitled to relief under either hardship standard, we ·will, as we have done in several other areas, utilize the totality of circumstances approach in this context, as well.

■ Because the parties have stipulated that no further evidence is necessary, we may decide the matter based on the entire record, including evidence presented at all prior hearings. The student loans in question were incurred from 1976 through 1979 for undergraduate studies, and from 1987 through 1988 for law school. See Joint Pre–Trial Order, Docket No. 41, ¶ 4. The balance due and owing is $39,935, plus interest at 9% per annum from September 1994. *Id.* at ¶ 3. The Debtor testified that she was earning $28,504 per year, *id.,* that her expenses were exceeding her income, and that items such as daycare, food, and clothing had increased since she was last in court. *See* Transcript of Hearing conducted on January 28, 1998. She also stated that on her federal W–4, she claims more dependents than she has, in order to increase her take home pay. *Id.*

She acknowledged that this practice will probably leave her with a tax deficiency at year end, but needs the extra cash flow now to pay her bills. *Id.* She also testified that she has been unable to pay the annual property tax for her automobile. *Id.*

The Debtor is a single parent, with sole custody of her five year old son. Her expenses at the present time are reasonable, maybe even unrealistically lean, and this is not the same high-lifestyle Debtor we saw in March 1995, who was living in a luxury apartment and getting substantial financial assistance from her parents. She now receives no financial assistance from her family. What we thought was a temporary financial setback in 1995, appears now to be a permanent fact of life, and the more we see of the Debtor, the more permanent her present financial stature appears to be. While gainfully employed, her wages have increased modestly, but barely keeping pace with the cost of living. Child support has been reduced to $25 per week from her ex-husband, who has paid nothing on his accruing arrearage because of his own financial and personal difficulties. The uncontradicted testimony is that Mr. Phelps has no assets, he lives in a boarding house, and practices law from his room. In assessing the Debtor's financial future, we must now conclude that her ex-husband's contribution will be negligible.

The only remaining unknown in this case is the class action law suit in which the Debtor is a Plaintiff. The Debtor testified that settlement talks are focusing on the payment of medical expenses and the costs to perform corrective surgical procedures, that to date she has not manifested any symptoms, and sees no prospect of a large monetary recovery from the litigation. In prior proceedings, the Debtor had provided both objecting creditors with authority to contact the attorney handling the class action litigation, so that they could assess the case for themselves. We have heard nothing on this score. Because

of this, we accord little weight to the class action suit as a significant potential asset.

In this case we have had the advantage of observing the Debtor for more than three years. Our early optimism regarding her future appears to have been in error, and we now acknowledge the reality of her present situation. Given the Debtor's past, current, and foreseeable financial condition,[5] her necessary living expenses, and all of the circumstances surrounding this case, we find that payment of the Sallie Mae/HESC student loan obligations would indeed impose an undue hardship upon the Debtor and her son. Accordingly, we find the debt to be dischargeable under 11 U.S.C. § 523(a)(8).

Enter Judgment consistent with this opinion, which we believe complies with the 'instructions of the Bankruptcy Appellate Panel.

---

5. While it is not an independent basis for this decision, we note that at a recent status review in the HEMAR adversary proceeding, Debtor's counsel represented that the Debtor received an unfavorable job review from her superior and, consequently, the modest salary increase she had received in the past was not awarded this year. Because of her weak job performance, the Debtor is concerned that she will be one of the early cuts that are anticipated when the merger of Fleet and Bank Boston is complete. *See* Transcript of Status Hearing, A.P. No. 94–1185, April 28, 1999.