In re Ronald K. NELSON and
Coralynn F. Nelson,
Debtors.

Coralynn F. Nelson, Plaintiff,

v.

La Crosse County District Attorney
(State of Wisconsin) and Tim
Gruenke, Defendants.

Bankruptcy No. 99–21588–7.
Adversary No. A99–2189–7.

United States Bankruptcy Court,
W.D. Wisconsin.

Sept. 18, 2000.

Galen W. Pittman, Hoffman, Pittman & Associates, La Crosse, for Plaintiff or Petitioner.

Richard E. Braun, Asst. Attorney General, Wisconsin Department of Justice, Madison, for Defendant or Respondent.

## ORDER DENYING DEFENDANTS' MOTION TO DISMISS OR, IN THE ALTERNATIVE, TO ABSTAIN

THOMAS S. UTSCHIG, Bankruptcy Judge.

In 1787, the United States were hardly that. At the Constitutional Convention in the summer of that year, delegates designed a system of government that they hoped would address many of the problems the colonies had experienced since winning their freedom from England. But when the Constitution went to the various states for ratification, there were numerous concerns about the power of the proposed national government. One concern surrounded the potential for an individual state to be sued in federal court, a fear which Alexander Hamilton sought to allay while writing *The Federalist No. 81.*[1] In direct fashion, he wrote that "it is inherent in the nature of sovereignty [for a state] not to be amenable to the suit of an individual WITHOUT ITS CONSENT." *The*

*Federalist No. 81,* at 414 (A.Hamilton) (G. Wills ed., 1982).

That statement, together with the concept of sovereign immunity it embodies, is at the heart of this case. The plaintiff has sued the La Crosse County District Attorney and Tim Gruenke, an assistant district attorney for La Crosse County, for a perceived violation of the discharge injunction contained in 11 U.S.C. § 524. The plaintiff contends that the district attorney is improperly pursuing a criminal indictment against her solely for the purpose of collecting debts which were discharged in her chapter 7 bankruptcy proceeding. She seeks the issuance of injunctive relief, as well as compensatory and punitive damages. The State of Wisconsin, through the Attorney General's office, has appeared on behalf of the district attorney and has filed a motion to dismiss the adversary proceeding for lack of subject matter jurisdiction. The Court's task is to determine whether the state of Wisconsin has surrendered its sovereign immunity in the context of this bankruptcy proceeding.

The facts are as follows. The debtor was the executive director of Discovery Child Care Center, Inc., a non-profit daycare facility. The center closed in September of 1998.[2] Shortly thereafter, both Discovery and the debtor filed bankruptcy. According to the debtor, a number of former employees contacted the district attorney's office regarding possible claims against the debtor.[3] Subsequently, the

1. The Federalist Papers were a series of 85 essays written in 1787 and 1788 by Alexander Hamilton, James Madison, and John Jay which expounded upon and advocated the adoption of the U.S. Constitution. In No. 81, Hamilton took "occasion to mention here a supposition which has excited some alarm upon very mistaken grounds." He addressed the concern that certain state obligations would give rise to suit in federal court, "a suggestion which ... prove[s] to be without foundation." *The Federalist No. 81,* at 414 (A.Hamilton) (G. Wills ed., 1982).

2. The facts surrounding the closure of the facility are disputed. The debtor contends that there was a coordinated "walk-out" by

employees that forced her to shut down. Regardless, it appears that the operation suffered from financial difficulties and closed for a combination of reasons.

3. Some of the debtor's assertions are without evidentiary support. For example, the debtor contends that defendant Tim Gruenke "adamantly" stated that the purpose of the criminal prosecution was to obtain payment for the Discovery employees, whose claims were otherwise dischargeable. For the moment, the Court will presume that the debtor can present facts which substantiate her claim that the criminal indictment is simply a pretext for debt collection efforts.

district attorney's office indicted the debtor for fraud.[4] The debtor responded by filing this adversary proceeding, contending that the district attorney's office was engaging in impermissible debt collection efforts. She requests that the Court issue an injunction under 11 U.S.C. § 105(a) and preclude the district attorney's office from proceeding with the criminal indictment.

■ The state's motion to dismiss is premised upon the Eleventh Amendment and the Supreme Court's recent decision in *Seminole Tribe v. Florida*, 517 U.S. 44, 116 S.Ct. 1114, 134 L.Ed.2d 252 (1996). The Eleventh Amendment provides that:

> The Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State.

U.S. Const. amend. XI. This reservation of state immunity from suit has been extended to suits brought by a state's own citizens. *See Hans v. Louisiana*, 134 U.S. 1, 10 S.Ct. 504, 33 L.Ed. 842 (1890); *Goldberg v. Ellett (In re Ellett)*, 243 B.R. 741 (9th Cir. BAP 1999). Furthermore, although the text of the Amendment appears to restrict only the Article III diversity jurisdiction of the federal courts, the Supreme Court has long recognized "the Eleventh Amendment to stand not so much for what it says, but for the presupposition ... which it confirms." *Blatchford v. Native Village of Noatak*, 501 U.S. 775, 111 S.Ct. 2578, 115 L.Ed.2d 686 (1991).

■ As such, the Eleventh Amendment reaffirms the sovereign status of each state in the federal system, and as Mr. Hamilton noted so long ago, "it is inherent in the nature of sovereignty not to be amenable to the suit of an individual without [the state's] consent." *See Seminole Tribe*, 116 S.Ct. at 1118, 134 L.Ed.2d at 265. However, sovereign immunity is not a bar to an action if (i) the state has waived its immunity and consents to suit in federal court or (ii) Congress has abrogated that immunity by unequivocally expressing an intent to do so and acts pursuant to a "valid exercise of power." *Id.*, 116 S.Ct. at 1118, 134 L.Ed.2d at 266; *see also Innes v. Kansas State Univ. (In re Innes)*, 184 F.3d 1275 (10th Cir.1999).

*Seminole Tribe* involved a suit against a state under the Indian Gaming Regulatory Act. Under the act, Congress provided that tribes could sue a state in federal court to compel the state to negotiate a gaming compact. The act had been passed pursuant to the Indian Commerce Clause of the Constitution, which provides that Congress may act "to regulate Commerce with foreign Nations, and among the several States, and with the Indian Tribes." The Supreme Court concluded that this clause did not permit Congress to unilaterally abrogate the states' immunity from suit. In fact, the Court concluded that congressional power in this regard was largely limited to legislation enacted pursuant to the Fourteenth Amendment. *Seminole Tribe*, 116 S.Ct. at 1125, 134 L.Ed.2d at 268. ("[B]y expanding federal power at the expense of state autonomy, [the Fourteenth Amendment] had fundamentally altered the balance of state and federal power struck by the Constitution.")

As a result of this decision, a number of courts have questioned the validity of 11 U.S.C. § 106(a), which purports to abrogate sovereign immunity "as to a governmental unit" for various purposes under the bankruptcy code.[5] For example, in

---

4. The exact nature of the charges against the debtor remain somewhat unclear. However, it appears that the claims surround the debtor's alleged mismanagement of Discovery Child Care Center, Inc. The Court has had an opportunity to previously conclude that certain allegations regarding the debtor's business conduct did not rise to the level of fraud under 11 U.S.C. § 523(a)(2)(A).

5. Under 11 U.S.C. § 101(27), a "governmental unit" is defined as including the states, municipalities, and other similar governmental entities.

*Schlossberg v. Maryland Comptroller of Treasury (In re Creative Goldsmiths of Washington, D.C., Inc.)*, 119 F.3d 1140, 1145 (4th Cir.1997), the Fourth Circuit Court of Appeals stated that to give proper effect to the Eleventh Amendment, "Congress' powers under Article I cannot be construed to empower it to expand federal jurisdiction by abrogating the states' sovereign immunities." Accordingly, the Fourth Circuit concluded that even though Article I of the Constitution authorized Congress to enact uniform bankruptcy laws, Congress could not utilize that authority to eliminate state sovereign immunity. *Id.*[6] Other courts have reached similar conclusions. *See Sacred Heart Hosp. v. Dep't of Pub. Welfare (In re Sacred Heart Hosp.)*, 133 F.3d 237 (3d Cir.1998); *Pitts v. Ohio Dep't of Taxation (In re Pitts)*, 241 B.R. 862 (Bankr. N.D.Ohio 1999); *Grabscheid v. Michigan Empl. Sec. Comm'n (In re C.J. Rogers, Inc.)*, 212 B.R. 265 (E.D.Mich.1997); *Harris v. Barall (In re Harris)*, 213 B.R. 796 (Bankr.D.Conn.1997).

■ Even the Seventh Circuit appears to have recognized, at least in dicta, that the Eleventh Amendment may prohibit certain bankruptcy-related actions against state entities. In *Dekalb County Div. of Family & Children Servs. v. Platter (In re Platter)*, 140 F.3d 676 (7th Cir.1998), a county family services division brought an adversary proceeding to determine the dischargeability of certain support obligations. The bankruptcy court concluded

the debts were dischargeable. On appeal, the county contended that the bankruptcy court had no authority to resolve the dischargeability issue.[7] The Seventh Circuit held that as the state chose to voluntarily enter the bankruptcy case, it removed itself from the protection of the Eleventh Amendment. *Id.* at 679. However, the notion that the state had waived its immunity and could not "run back to seek Eleventh Amendment protection when it does not like the result," *id.* at 680, suggests that there *might* in fact be a measure of immunity under other circumstances. *See* Leonard H. Gerson, "A Bankruptcy Exception to Eleventh Amendment Immunity: Limiting the *Seminole Tribe* Doctrine," 74 Am. Bankr.L.J. 1, 21 (Winter 2000).

The state of Wisconsin argues that this adversary proceeding must be dismissed because it has not consented to suit or waived its sovereign immunity. The plaintiff seemingly concedes the notion that the Eleventh Amendment applies in these proceedings, but suggests that the state waived its immunity by filing a proof of claim in the Discovery Child Care Center, Inc., corporate bankruptcy. She argues that this proof of claim was "interrelated" with the pending criminal proceedings and both chapter 7 bankruptcy cases. According to the plaintiff, the state chose to voluntarily avail itself of the bankruptcy forum, and cannot now use the Eleventh

---

6. While one might suggest that this case applies *Seminole Tribe* to bankruptcy proceedings in rather sweeping fashion, subsequent decisions of the Fourth Circuit suggest otherwise. In *Maryland v. Antonelli Creditors' Liquidating Trust*, 123 F.3d 777 (4th Cir.1997), the court held that the state of Maryland was bound by the terms of a debtor's confirmed plan of reorganization as the plan did not constitute a "suit" against the state, and the power of the bankruptcy court in that context derived not from jurisdiction over the state, but rather from "jurisdiction over debtors and their estates." *Id.* at 787. In the more recent decision of *Virginia v. Collins (In re Collins)*, 173 F.3d 924 (4th Cir.1999), the court concluded that the Eleventh Amendment did not

bar a debtor from reopening a bankruptcy proceeding to discharge a judgment debt owed to the Commonwealth of Virginia arising from unpaid bail bonds. The court stated that "if a state could assert Eleventh Amendment immunity to avoid the effect of a discharge order, the bankruptcy system would be seriously undermined." *Id.* at 930.

7. The Eleventh Amendment issue had apparently not been raised prior to the appeal. However, it is "sufficiently jurisdictional that a state may raise it at any time." *Platter*, 140 F.3d at 679. In the present case, of course, the state has raised the issue at the outset.

Amendment as a shield to avoid the Court's jurisdiction.

■ As the Seventh Circuit noted in *Platter,* "When a state chooses to avail itself of the bankruptcy court as a plaintiff, the Eleventh Amendment does not apply and the state will receive the same treatment as other parties." 140 F.3d at 680. There are indeed reported decisions which interpret the notion of state waiver rather broadly. *See Wyoming Dep't of Transp. v. Straight (In re Straight),* 143 F.3d 1387 (10th Cir.1998) (filing of a proof of claim by one state agency waived immunity for another); *Georgia Dep't of Revenue v. Burke (In re Burke),* 146 F.3d 1313 (11th Cir. 1998) (filing proof of claim subjected state to judgment for violation of automatic stay and discharge injunction).

■ Generally, however, waiver of sovereign immunity requires an "unequivocal indication" that the state intends to consent to federal jurisdiction that would otherwise be barred by the Eleventh Amendment. *Innes,* 184 F.3d at 1278. The plaintiff in this case and Discovery Child Care Center, Inc., remain separate legal entities notwithstanding her argument that various personal guarantees render them essentially indistinguishable. The Court questions whether she would be so quick to surrender the shield from liability offered by the corporate form were she to have been sued by a corporate creditor to whom she owed no personal liability. The reality is that the debtor and Discovery Child Care Center, Inc., do not appear to be alter egos of one another, and as a result the mere filing of a proof of claim cannot constitute a waiver of sovereign immunity.

■ That said, the Court concludes that the real issue is whether the state actually has any immunity to waive. After *Seminole Tribe,* courts have routinely assumed that as the bankruptcy clause is also found in Article I of the Constitution, it must be treated much the same as the Indian Commerce Clause provision addressed by the Supreme Court.[8] A close examination of the context of the Eleventh Amendment and the notion of sovereign immunity leads to a strikingly different conclusion. "Begin at the beginning," said the king in *Alice's Adventures in Wonderland,* "and go on till you come to the end." As the Supreme Court noted, the Eleventh Amendment is read more broadly than its language would suggest simply because "we have understood the Eleventh Amendment to stand not so much for what it says, but for the presupposition ... which it confirms." *Seminole Tribe,* 116 S.Ct. at 1122, 134 L.Ed.2d at 265.

■ What, then, is the presupposition confirmed by the Amendment? First, that each state is a sovereign entity in the federal system, and second, that "it is inherent in the nature of sovereignty not to be amenable to the suit of an individual without its consent." *Id.* (quoting from *The Federalist No. 81,* at 487 (A.Hamilton) (C. Rossiter ed., 1961)). The majority opinion in *Seminole Tribe* relies heavily upon Hamilton's writings to support its understanding of sovereign immunity. For example, in discussing the require-

---

**8.** The Supreme Court noted in passing that the issue of abrogation of state sovereign immunity by federal bankruptcy, antitrust, or copyright laws had not been widely discussed and that there was "no established tradition in the lower federal courts of allowing enforcement of those federal statutes against the States." *Seminole Tribe,* 116 S.Ct. at 1132 n. 16, 134 L.Ed.2d at 277 n. 16. Of course, this does not take into account the Supreme Court's own holdings in such cases as *New York v. Irving Trust Co.,* 288 U.S. 329, 53 S.Ct. 389, 77 L.Ed. 815 (1933) (state bound by deadline to file claims), *Gardner v. New Jersey,* 329 U.S. 565, 67 S.Ct. 467, 91 L.Ed. 504 (1947) (bankruptcy court had jurisdiction to deal with state tax liens), *New Jersey v. Anderson,* 203 U.S. 483, 27 S.Ct. 137, 51 L.Ed. 284 (1906) (state interpretation of what constituted a tax not controlling in bankruptcy proceedings), and *Perez v. Campbell,* 402 U.S. 637, 91 S.Ct. 1704, 29 L.Ed.2d 233 (1971) (state law suspending debtor's driver's license pending payment of certain outstanding judgments violated the Supremacy Clause).

ment of state consent to suit, the Court quoted Hamilton as writing, "Unless, therefore, there is a surrender of this immunity in the plan of the convention, it will remain with the States." 116 S.Ct. at 1130 n. 13, 134 L.Ed.2d at 276 n. 13 (quoting from *The Federalist No. 81*, at 487–88 (A.Hamilton) (C. Rossiter ed., 1961)).

■■■ If the Eleventh Amendment acted to preserve the state's sovereign immunity in the context of bankruptcy proceedings, this Court would have little choice but to conclude that Congress could not abrogate that immunity when enacting the bankruptcy laws. *Seminole Tribe*, 116 S.Ct. at 1131, 134 L.Ed.2d at 277 ("Even when the Constitution vests in Congress complete law-making authority over a particular area, the Eleventh Amendment prevents congressional authorization of suits by private parties against unconsenting States"). However, as the Supreme Court has noted on another occasion, sovereign immunity "neither derives from nor is limited by" the Eleventh Amendment but stems instead from the structure of the Constitution itself. *Alden v. Maine*, 527 U.S. 706, 119 S.Ct. 2240, 144 L.Ed.2d 636, 652 (1999).

Thus, if the Constitution itself contemplated the abrogation of sovereign immunity in a particular area, the Eleventh Amendment does not act to restore the states to their pre-ratification sovereign status. A state's ratification of the Constitution or admission into the Union on an "equal footing" with the other states resulted in a surrender by the states of certain pre-existing rights. *Id.* In this regard, this Court concludes that bankruptcy law is indeed an area in which there was a "surrender of [sovereign] immunity in the plan of the convention." *See Seminole Tribe*, 116 S.Ct. at 1140 n. 13, 134 L.Ed.2d at 276 n. 13. In fact, the very writings cited by the Supreme Court dictate this result. *See Bliemeister v. Industrial Comm'n (In re Bliemeister)*, 251 B.R. 383 (Bankr. D.Ariz.2000).

In a passage in the oft-quoted *The Federalist No. 81*, Hamilton recognized that there were certain limited areas in which the states did indeed waive their sovereign immunity as part of the compact embodied by the Constitution. While discussing the scope of federal court jurisdiction, Hamilton wrote that "the circumstances which are necessary to produce an alienation of state sovereignty, were discussed in considering the article of taxation, and need not be repeated here." *The Federalist No. 81*, at 414 (A.Hamilton) (G. Wills ed., 1982). There has been little discussion of the scope of these "circumstances," but the Supreme Court has clearly recognized their existence. For example, in *Alden*, Justice Kennedy's majority opinion acknowledged these original exceptions to sovereign immunity when he wrote that "the States' immunity from suit is a fundamental aspect of the sovereignty which the States enjoyed before the ratification of the Constitution, and which they retain today … *except as altered by the plan of the Convention* or certain constitutional Amendments." 119 S.Ct. at 2247, 144 L.Ed.2d at 652 (emphasis added).

The article on taxation Hamilton mentioned in *The Federalist No. 81* as the source of "the circumstances necessary to produce an alienation of state sovereignty" is itself contained in *The Federalist No. 32*. In the course of that article Hamilton stated that "the State Governments would clearly retain all the rights of sovereignty which they before had and which were not by that act exclusively delegated to the United States." Among the three cases in which "this alienation of State sovereignty" exists under the Constitution, Hamilton gives as an example:

> The third will be found in that clause, which declares that Congress shall have power "to establish an UNIFORM RULE of naturalization throughout the United States." This must necessarily be exclusive, because if each State had power to prescribe a DISTINCT RULE there could be no UNIFORM RULE.

*The Federalist No. 32,* at 152–53 (A. Hamilton) (G. Wills ed., 1982).

 The same clause that grants Congress "exclusive" power over immigration and naturalization gives similar authority over bankruptcy. *Bliemeister,* 251 B.R. at 389. The Constitution specifically provides that Congress shall have the power "[t]o establish an uniform Rule of Naturalization, and uniform Laws on the subjects of Bankruptcies throughout the United States." Accordingly, the states retained no more sovereignty over bankruptcy law than they did over naturalization. *Bliemeister,* 251 B.R. at 390.[9] While it is possible to question why the framers considered bankruptcy to be of such national importance as to require that the states cede their sovereign immunity over such proceedings, a historical analysis reveals that the subject of debtor-creditor rights was a significant concern. Indeed, at the time the Constitution was ratified, there was considerable contention among the states over the thousands incarcerated in debtor's prisons. Under the circumstances,

> [B]ankruptcy law, and particularly the discharge, was very much an issue involved with states' sovereignty, because it was a limitation on the power of the sovereign to imprison debtors and punish traitors, or to grant individual relief. When the states agreed to a uniform federal rule, they had to understand that they were surrendering their sovereignty over the subject of bankruptcies.

*Id.*[10]

 This Court is mindful of the importance of state sovereignty and the delicate relationship between the national government and the states designed by the Framers of the Constitution. The Constitution would never have been ratified if the states were to be stripped of their sover-

---

9. The Supreme Court has "long recognized the preeminent role of the Federal Government with respect to the regulation of aliens within our borders." *Toll v. Moreno,* 458 U.S. 1, 102 S.Ct. 2977, 73 L.Ed.2d 563 (1982). This broad grant of authority stems from, among other things, the constitutional power to "establish a uniform Rule of Naturalization." State laws which infringe upon this federal authority are heavily scrutinized. In *Takahashi v. Fish & Game Comm'n,* 334 U.S. 410, 68 S.Ct. 1138, 92 L.Ed. 1478 (1948), the Court stated that "the states are granted no such powers; they can neither add to nor take from the conditions lawfully imposed by Congress upon admission, naturalization, and residence of aliens in the United States." This constitutional grant of the power to create "uniform" laws—be they regarding naturalization *or* bankruptcy—would thus seem far more significant than some courts have recognized. Compare *Schlossberg,* 119 F.3d at 1145–46 ("We find unpersuasive the argument . . . that the Bankruptcy Clause's provision for the enactment of 'uniform laws on the subject of Bankruptcies' . . . requires Congressional powers under this clause to be distinguished from other Article I powers.") with *Gardner,* 329 U.S. at 577, 91 L.Ed. at 517 ("It is the *exclusive* jurisdiction of the reorganization court which gives it power to preserve [a debtor's estate] . . . and to prevent it from being divided up and dismembered piecemeal.") (emphasis added).

10. Bankruptcy was apparently believed to be an appropriate subject of federal legislation because of the problems that varying and discriminatory state laws caused for nonresident creditors and interstate commerce in general. *See* Judith Koffler, "The Bankruptcy Clause and Exemption Laws: A Reexamination of the Doctrine of Geographic Uniformity," 58 N.Y.U. L.Rev. 22, 36 (1983). In *The Federalist No. 42,* James Madison described the purpose of the bankruptcy clause as follows:

> The power of establishing uniform laws of bankruptcy is so intimately connected with the regulation of commerce, and will prevent so many frauds where the parties or their property may lie or be removed into different states that the expediency of it seems not likely to be drawn into question.

If this is the case, the power of this "uniform" forum will be greatly impaired by a doctrine that allows states to avoid its jurisdiction. States are among the largest class of creditors in bankruptcy courts; the extension of the *Seminole Tribe* doctrine into this area "would pull out chunks of an estate from the [bankruptcy] court and transfer a part of the struggle . . . into . . . state tribunals." *Gardner,* 329 U.S. at 577, 91 L.Ed. at 516. This would "seriously impair the power of the court to administer the estate." *Id.*

eign authority "except as expressly provided by the Constitution itself." *Alden*, 119 S.Ct. at 2253, 144 L.Ed.2d at 661; *see also Atascadero State Hospital v. Scanlon*, 473 U.S. 234, 105 S.Ct. 3142, 87 L.Ed.2d 171 (1985). A brief review of the history of American bankruptcy law only highlights the broad power ceded to the national government by the states under the bankruptcy clause. The modern bankruptcy code is not merely a vehicle for debt collection, but focuses on rehabilitation of debtors and offers them a "fresh start." *Grogan v. Garner*, 498 U.S. 279, 282, 111 S.Ct. 654, 112 L.Ed.2d 755 (1991) (The purpose of the bankruptcy code is to permit debtors to reorganize their financial affairs, and enjoy a "new opportunity in life"). Such has not always been the case, and for the states to surrender the right to deal with debtors as they saw fit constituted a surrender of a significant amount of autonomy.[11]

Initially, the bankruptcy laws were far less forgiving than they are today, and their scope was far more limited. For example, the country's first national bankruptcy law, the Bankruptcy Act of 1800, applied only to merchants and could only be commenced by a creditor. *See generally* Charles Jordan Tabb, "The History of the Bankruptcy Laws in the United States," 3 Am. Bankr.Inst. L.Rev. 5 (1995). Over the ensuing two centuries, the face of bankruptcy law has changed dramatically from a creditor-oriented method of collection to a vehicle for affording debtors a discharge of their debts, a notion that was nothing if not controversial in 1787.[12] That Congress can enact sweeping legislation altering the rights of debtors and creditors only further reflects the fact that Congress' power to enact "uniform" bankruptcy laws abrogates state authority in this area.[13] As the *Bliemeister* court stated, "The people and the states agreed in the original plan of the convention that if Congress should elect to act on the subject of bankruptcies, the states surrendered their sovereign powers on the subject." 251 B.R. at 389–90.[14]

**11.** At the time, "the bankruptcy discharge was understood as not merely a release from debts but more importantly a discharge from debtor's prison." *Bliemeister*, 251 B.R. at 390. Imprisonment for debt was the order of the day, from the time of the English Statute of Merchants in 1285 until the mid-nineteenth century, where debtor's prisons were harshly depicted in the works of Charles Dickens (whose own father was imprisoned for his debts). *See* Charles Jordan Tabb, "The History of the Bankruptcy Laws in the United States," 3 Am. Bankr.Inst. L.Rev. 5, 7 (1995). The common law routinely authorized "body execution"—*i.e.*, seizure of the body of the debtor, to be held until payment of the debt. *Id.*

**12.** The discharge for a "cooperative" debtor was introduced with the passage of the Statute of Anne in 1705. It also authorized the death penalty for fraudulent debtors. Tabb, *supra* note 11, at 10. Creditor consent to this discharge was added in 1706. In colonial America, many states had laws regarding debtor-creditor relations, a condition that continued under the Articles of Confederation. *Id.* at 12–13. When Congress did actually pass bankruptcy legislation in 1800, it was modeled on English law in that while a discharge existed, it could only be granted if two-thirds of the creditors agreed. *Id.* at 14–15.

**13.** For example, the bankruptcy code enacted in 1978 provides debtors with various exemptions and also provides for the avoidance of non-possessory, non-purchase money security interests in various items, including so-called "tools of the trade." *See* 11 U.S.C. § 522(f). This provision has survived challenge as an unconstitutional "taking" of property. *In re Thompson*, 867 F.2d 416 (7th Cir.1989). Such provisions reflect that the bankruptcy clause also affords Congress the power to impair the obligation of contracts, a power expressly denied to the states by Art. I, § 10 of the Constitution. *See Hanover Nat'l Bank v. Moyses*, 186 U.S. 181, 22 S.Ct. 857, 46 L.Ed. 1113 (1902). As such, Hamilton's comments in *The Federalist No. 32* suggest that sovereign immunity would be abridged for this reason as well, as it is an instance where the Constitution "granted in one instance an authority to the Union and in another prohibited the States from exercising like authority." *The Federalist No. 32*, at 152 (A. Hamilton) (G. Wills ed., 1982).

**14.** It is interesting to note that until passage of the Bankruptcy Act of 1898, Congress en-

Further, as has been noted previously, the Supreme Court has long acknowledged the supremacy of the bankruptcy laws. For example, in *New York v. Irving Trust Co.*, 288 U.S. 329, 53 S.Ct. 389, 77 L.Ed. 815 (1933), the Court rejected the argument that the states were not subject to the same requirements as other creditors in bankruptcy cases. The Court stated that "orderly and expeditious proceedings would be impossible and a fundamental purpose of the Bankruptcy Act would be frustrated" if a state's sovereign immunity precluded the enforcement of bankruptcy court orders. *Id.*, 288 U.S. at 333, 77 L.Ed. at 818. And in *Perez v. Campbell*, 402 U.S. 637, 91 S.Ct. 1704, 29 L.Ed.2d 233 (1971), the Court struck down state regulatory provisions that resulted in the suspension of a debtor's driver's license until the debtor satisfied certain outstanding judgments. The Court stated that "any state legislation which frustrates the full effectiveness of federal law is rendered invalid by the Supremacy Clause." *Id.*, 402 U.S. at 652, 29 L.Ed.2d at 244.

In its brief, the State cites a number of decisions that conclude the Eleventh Amendment renders states immune from certain types of bankruptcy proceedings absent some form of "waiver." This Court, however, must adopt the admittedly minority position that this "waiver" of immunity is reflected in the Constitution itself. Unlike the majority of federal cases involving claims against states, bankruptcy proceedings are one of the rare abrogations of sovereign immunity hammered into the actual text of the very document that frames the balance of power between the states and the national government. If, as the Supreme Court instructs, the Eleventh Amendment does no more than preserve the rights reserved to the states at the time the Constitution was ratified, then that Amendment simply cannot serve as a shield against the jurisdiction of this Court.

The logic of this understanding of Congress' power to make "uniform laws on the subject of Bankruptcies" is underscored by the contradictory and confusing cases which have resulted in the wake of *Seminole Tribe*. The Fourth Circuit's decision in *Schlossberg* swept with a broad brush, articulating a policy that "Congress has no authority under the Bankruptcy Clause . . . to abrogate state sovereign immunity in federal courts." 119 F.3d at 1145. In *Antonelli*, however, the court held that a state was bound by the terms of a confirmed plan because the jurisdiction of the bankruptcy court flowed from its power over the debtor and its estate, rather than any jurisdiction over the state. 123 F.3d at 787. Another factor in the *Antonelli* determination was that *Schlossberg* involved an adversary proceeding (together with the attendant summons and complaint). According to the court, confirmation of a chapter 11 plan did not involve the issuance of a summons and thus did not constitute a "suit" against the state for Eleventh Amendment purposes. *Id.*

---

acted only short-term bankruptcy relief, and in each case the laws were subsequently repealed. Thus, the states were free to act in bankruptcy matters for all but 16 of the first 109 years after the Constitution was ratified. Tabb, *supra* note 11 at 13–14. This fact should be taken into account when considering the Supreme Court's statement in *Seminole Tribe* that there is no "established tradition . . . of allowing enforcement of those federal statutes against a State." Quite simply, federal bankruptcy laws were not in existence during much of the 19th century, and so the issue was not likely to have arisen. This lack of jurisprudence does not alter the ines-

capable conclusion that if Congress chose to act pursuant to the bankruptcy clause, state sovereignty must give way to the valid exercise of that power. In virtually every instance in the 20th century, the Supreme Court has upheld the power of the bankruptcy courts when confronted with state claims of immunity. *See supra* note 8 and cases cited therein. This has caused one court to note that "bankruptcy has long been considered a special area of the law," and "[r]equirements of a workable bankruptcy system may also be seen to favor a centralized system." *In re Rose*, 187 F.3d 926, 930 n. 8 (8th Cir.1999).

The Fourth Circuit then muddied these already dirty waters even further when it ruled in *NVR Homes, Inc. v. Clerks of the Circuit Courts (In re NVR, LP)*, 189 F.3d 442 (4th Cir.1999), that a bankruptcy court was prohibited from hearing a "contested matter" by the Eleventh Amendment. The basis for this decision was that the dispute in question was more than simply an "administrative" matter. *Id.* at 452. The conceptual difficulty arises in that the bankruptcy code and rules also consider an objection to the confirmation of a plan— the type of proceeding permitted in *Antonelli*—a contested matter. *See* Lawrence P. King, *Collier on Bankruptcy* 9014.01 (15th ed. rev.1999). These decisions lead only to confusion, as bankruptcy courts must now wrestle with the issue of what type of "contested matters" might be prohibited by the Eleventh Amendment. The reality is that such decisions impair the uniform application of the bankruptcy code, a result which is squarely at odds with the language and intent of the Constitution. For all of these reasons, the state's motion to dismiss must be denied.

 Even if the Eleventh Amendment were applicable to bankruptcy proceedings, certain aspects of the plaintiff's complaint would nonetheless survive the state's motion to dismiss under the exception to sovereign immunity first articulated by the Supreme Court in *Ex Parte Young*, 209 U.S. 123, 28 S.Ct. 441, 52 L.Ed. 714 (1908). This doctrine permits suits against state officials to obtain injunctive relief. *See Seminole Tribe*, 116 S.Ct. at 1131 n. 14, 134 L.Ed.2d at 276 n. 14 ("[A]n individual can bring suit against a state officer in order to ensure that the officer's conduct is in compliance with federal law."). Under *Young*, a federal court may enjoin state officials to conform their future conduct to the requirements of federal law. *Alston v. State Bd. of Med. Exam'rs (In re Alston)*, 236 B.R. 214 (Bankr.D.S.C.1999). As one court has stated, "[P]ersons aggrieved by a state's continuing violation of [the bankruptcy code] may obtain injunc-

tive relief ... in order to remedy a state officer's ongoing violation of Federal law." *Schmitt v. Missouri Western State College (In re Schmitt)*, 220 B.R. 68, 73 (Bankr. W.D.Mo.1998).

 This doctrine carves out a necessary exception which ensures that state officials not "employ the Eleventh Amendment as a means of avoiding compliance with federal law." *DeAngelis v. Laskey (In re DeAngelis)*, 239 B.R. 426, 431 (quoting *P.R. Aqueduct & Sewer Auth. v. Metcalf & Eddy*, 506 U.S. 139, 113 S.Ct. 684, 121 L.Ed.2d 605 (1993)). This exception is also quite narrow, as it is designed simply to ensure proper state behavior in the face of federal law, not to erode the traditional scope of the Eleventh Amendment. As such, the court's jurisdiction under *Young* is limited to requests for prospective declaratory and injunctive relief. *DeAngelis*, 239 B.R. at 431; *see also In re Ellett*, 243 B.R. 741, 744 (9th Cir. BAP 1999) (*Young* doctrine invoked by allegation of ongoing violation of federal law and request for prospective relief). The court in *Lenke v. Tischler (In re Lenke)*, 249 B.R. 1, 5 (Bankr.D.Ariz.2000), held that under circumstances similar to those in the present case, a suit could be pursued against a county or a county attorney "to the extent that it merely seeks prospective injunctive relief."

 In this case, the plaintiff's complaint seeks not only injunctive relief, but actual and punitive damages as well. At the present time, the Court concludes it is unnecessary to dismiss those requests from the plaintiff's complaint. First, her request for monetary damages stems from the same set of operative facts as the requested injunction. The Court has yet to consider whether the plaintiff is entitled to *any* relief at all. Second, the Court previously ruled that the state surrendered or waived its sovereign immunity in this area when it joined the Union "upon an equal footing with the other States." *Alden*, 119 S.Ct. at 2247, 144 L.Ed.2d at 652. As such, the state may be subject to

the costs and fees associated with the plaintiff's enforcement of the discharge injunction, together with other relief as necessary. *See In re Burke*, 146 F.3d 1313, 1319 (11th Cir.1998) (waiver of immunity "includes the bankruptcy court's enforcement of the discharge injunction").[15]

■ The matter will therefore be scheduled for an evidentiary hearing, at which time the Court will consider whether the La Crosse County District Attorney has violated the discharge injunction found in 11 U.S.C. § 524(a)(2).[16] The Court recognizes that it is often difficult to separate legitimate prosecutorial discretion from an attempt to circumvent the bankruptcy discharge on behalf of a debtor's alleged victims. Certainly it is true that the state has an interest in prosecuting criminal conduct, and its police power in this regard is in no manner circumscribed by the bankruptcy code. *See Grogan*, 498 U.S. at 287, 111 S.Ct. 654 (The fresh start in bankruptcy is limited to the "honest but unfortunate debtor"); *United States v. Alexander*, 743 F.2d 472, 480 (7th Cir.1984) ("The bankruptcy proceeding is largely unconcerned with criminality"). The difficulty arises when in the course of criminal proceedings the state court directs the debtor to make restitution on claims which were subject to a bankruptcy discharge, or if the criminal prosecution is merely a pretext for debt collection efforts.

■ The Seventh Circuit has stated that there is "nothing in the bankruptcy code that evinces a congressional intent to prevent sentencing judges from imposing such potentially rehabilitative probation

conditions [as restitution]," even where the underlying obligation has been discharged. *Alexander*, 743 F.2d at 480. In the more recent case of *Matter of Towers*, 162 F.3d 952 (7th Cir.1998), the court concluded that a civil restitution award was dischargeable under 11 U.S.C. § 523(a)(7), which provides an exception to discharge for "a fine, penalty, or forfeiture payable to and for the benefit of a governmental unit." In *Towers*, the debtor had been ordered to pay some $210,000.00 in restitution to the Illinois Attorney General, which would then be paid to the victims of the debtor's alleged fraudulent activities. The court concluded that the final requirement of § 523(a)(7)—that the amount be payable to *and for the benefit of* a governmental unit—had not been satisfied. *Id.* at 956.

However, in *Kelly v. Robinson*, 479 U.S. 36, 107 S.Ct. 353, 93 L.Ed.2d 216, 229 (1986), the Supreme Court held that § 527(a)(7) "preserves from discharge any condition a state criminal court imposes as part of a criminal sentence." According to the Court:

> Because criminal proceedings focus on the State's interests in rehabilitation and punishment, rather than the victim's desire for compensation, we conclude that restitution orders imposed in such proceedings operate "for the benefit of" the State. Similarly, they are not assessed "for … compensation" of the victim. The sentence following a criminal conviction necessarily considers the penal and rehabilitative interests of the State. Those interests are sufficient to place

---

**15.** Several remarks are required in this regard. First, there has been *no* finding that the state has in fact violated the discharge injunction. Second, the Court agrees that proof of actual damage may be difficult. *See Burke*, 146 F.3d at 1319–20 n. 12. Attorneys' fees and costs may be the most obvious element of financial harm suffered when a state persists in a course of conduct which violates the discharge. However, in *Burke* the state conduct "amounted to nothing more than sending a few collection letters." *Id.* Here, the state has pursued criminal charges

against the debtor, with attendant media attention and public notoriety. Whether the plaintiff may seek actual damages for such conduct is a determination which must wait for another day.

**16.** This section provides that a bankruptcy discharge "operates as an injunction against the commencement or continuation of an action … to collect, recover, or offset any such debt as a personal liability of the debtor."

restitution orders within the meaning of § 523(a)(7).

*Id.,* 479 U.S. at 53, 93 L.Ed.2d at 230–31.

Despite the broad language of *Kelly,* courts seem inclined to read its holding somewhat narrowly. For example, in *Towers* the Seventh Circuit concluded that a civil restitution order was dischargeable despite "some language" in *Kelly* that the benefit to the state need not be pecuniary. The court stated, "the context in which 'benefit' appears [in 523(a)(7) ]—*'payable to and* for the benefit of a government unit'—implies that the 'benefit' in question is the benefit of the money that is 'payable to' the government unit." 162 F.3d at 956. In *Kelly,* the government received and kept the money; in *Towers,* the "benefit" would have flowed onward to the victims. As a result, the Seventh Circuit concluded that the restitution order was dischargeable. *Id.*

This holding seems somewhat at odds with certain statements in *Kelly.* For example, the Supreme Court observed that, absent its holding, some restitution orders would not fit within any other discharge exception, such as an instance where "a judge in a negligent homicide case might sentence the defendant to probation, conditioned on the defendant's paying the victim's husband compensation for the loss the husband sustained when the defendant killed his wife." 479 U.S. at 48, 93 L.Ed.2d at 228. Clearly, such restitution would flow to the victim, not the state, yet the Court seemed inclined to hold that such an order would be nondischargeable. *Id.,* 479 U.S. at 49, 93 L.Ed.2d at 230–31. *Towers,* however, appears to suggest that *Kelly* should be limited to situations where the restitution is only payable to the government, and at least one other court seems to agree. In *Lenke,* the court stated:

> [I]t is certainly possible that the Debtor could here prove that, if convicted and a monetary sanction were imposed, the punishment was in fact compensation for pecuniary loss, or was for the benefit of

the victim, and therefore subject to the discharge.

249 B.R. at 12.

In this case, the debtor has yet to demonstrate whether the district attorney's actions are merely a pretext to debt collection, or that restitution is a likely punishment. Therefore, the Court cannot conclude whether it is even necessary to delve into the legal issues raised by *Towers* and *Kelly* until the evidentiary issues are more fully developed.

Accordingly,

IT IS ORDERED that the defendants' motion to dismiss is denied, and the matter will be set for a scheduling conference to establish the date and time of an evidentiary hearing on the debtor's request for injunctive relief.