ELECTRONIC CITATION:  2001 FED App. 0006A (6th Cir.)
File Name:  01b0006a.06

**BANKRUPTCY APPELLATE PANEL OF THE SIXTH CIRCUIT**

| | | |
|---|---|---|
| In re:  PAMELA L. HOOD, | ) | |
| | ) | |
| Debtor. | ) | |
| _____ | ) | |
| | ) | |
| PAMELA L. HOOD, | ) | |
| | ) | |
| Plaintiff-Appellee, | ) | |
| | ) | |
| v. | ) | No. 00-8062 |
| | ) | |
| TENNESSEE STUDENT | ) | |
| ASSISTANCE CORPORATION, | ) | |
| | ) | |
| Defendant-Appellant. | ) | |
| _____ | ) | |

Appeal from the United States Bankruptcy Court
for the Western District of Tennessee, Western Division at Memphis.
No. 99-22606, Adv. Pro. 99-0847.

Argued: February 7, 2001

Decided and Filed:  May 22, 2001

Before: AUG, MORGENSTERN-CLARREN, and RHODES,
Bankruptcy Appellate Panel Judges.

_____

**COUNSEL**

**ARGUED:**  Sally Ramsey, OFFICE OF THE ATTORNEY GENERAL, Nashville, Tennessee, for Appellant.  William A. Cohn, COHN LAW FIRM, Cordova, Tennessee, for Appellee. **ON BRIEF:** Sally Ramsey, OFFICE OF THE ATTORNEY GENERAL, Nashville, Tennessee, for Appellant.  William A. Cohn, COHN LAW FIRM, Cordova, Tennessee, for Appellee.

———————————

**AMENDED OPINION**

———————————

STEVEN RHODES, Chief Bankruptcy Appellate Panel Judge. The Debtor, Pamela L. Hood, filed an adversary proceeding seeking a determination that her debt to the Tennessee Student Assistance Corporation (TSAC) is nondischargeable under 11 U.S.C. § 523(a)(8). The bankruptcy court denied TSAC's motion to dismiss based on sovereign immunity and TSAC appealed.

The Panel concludes that as a part of the plan of the Constitutional Convention, the States ceded to Congress their sovereignty over bankruptcy discharge matters. Therefore, the bankruptcy court's order denying TSAC's motion to dismiss is **AFFIRMED**.

## I.  ISSUE ON APPEAL

The sole issue on appeal is whether TSAC has sovereign immunity in bankruptcy discharge matters.

## II.  JURISDICTION AND STANDARD OF REVIEW

The Bankruptcy Appellate Panel of the Sixth Circuit has jurisdiction to decide this appeal. The United States District Court for the Western District of Tennessee has authorized appeals to the BAP. A final order of a bankruptcy court may be appealed by right under 28 U.S.C. § 158(a)(1). For purposes of appeal, an order is final if it "'ends the litigation on the merits and leaves nothing for the court to do but execute the judgment.'" *Midland Asphalt Corp. v. United States*, 489 U.S. 794, 798, 109 S. Ct. 1494, 1497 (1989) (citations omitted).

Hood filed a motion to dismiss this appeal, asserting that the order denying the motion to dismiss is not a final order. On September 19, 2000, the Panel denied Hood's motion, because the collateral order doctrine allows immediate appellate review of an order denying a claim of Eleventh Amendment Immunity. *Seminole Tribe of Fla. v. Florida*, 517 U.S. 44, 52, 116 S. Ct. 1114, 1121 (1996); *Puerto Rico Aqueduct & Sewer Auth. v. Metcalf & Eddy, Inc.*, 506 U.S. 139, 144-45, 113 S. Ct. 684, 688 (1993).

The application of a sovereign immunity defense is an issue of law subject to de novo review. *Seminole Tribe*, 517 U.S. 44. "De novo review requires the Panel to review questions of law independent of the bankruptcy court's determination." *First Union Mortgage Corp. v. Eubanks* (*In re Eubanks*), 219 B.R. 468, 469 (B.A.P. 6th Cir. 1998) (citation omitted).

## III.   FACTS

Between July of 1988 and February of 1990, Hood signed promissory notes for educational loans guaranteed by TSAC. On February 26, 1999, she filed a chapter 7 bankruptcy petition, at which time she owed money on these student loans. TSAC took no action in the bankruptcy case. On June 4, 1999, Hood was granted a discharge.

On October 14, 1999, she filed an adversary proceeding requesting discharge of her educational loans on the grounds of undue hardship under 11 U.S.C. § 523(a)(8). After TSAC was added as a defendant, it filed a motion to dismiss, asserting that the adversary proceeding was barred by sovereign immunity. The bankruptcy court denied the motion to dismiss, holding that 11 U.S.C. § 106 properly abrogated TSAC's sovereign immunity. TSAC filed this timely appeal.

## IV.   DISCUSSION

A.  Introduction

This opinion holds that as a part of the plan of the Constitutional Convention, the States ceded their sovereignty over matters relating to the discharge in bankruptcy. In so holding, the Panel applies the analytical framework that the Supreme Court has now firmly established for determining the issue. *Seminole Tribe of Fla. v. Florida*, 517 U.S. 44, 116 S. Ct. 1114 (1996). *See also Board of Trustees of the Univ. of Al. v. Garrett*, 531 U.S. 356, 121 S. Ct. 955, 962 (2001); *Alden v. Maine*, 527 U.S. 706, 730-33, 119 S. Ct. 2240 (1999); *Kimel v. Florida Bd. of Regents*, 528 U.S. 62, 120 S. Ct. 631 (2000); *Florida Prepaid Postsecondary Educ. Exp. Bd. v. College Sav. Bank* (II), 527 U.S. 627, 636, 119 S. Ct. 2199 (1999); *College Sav. Bank v. Florida Prepaid Postsecondary Educ. Exp. Bd.* (I), 527 U.S. 666, 672, 119 S. Ct. 2219 (1999).

The first step in this analysis is to recognize the sovereignty of the States and the important and inherent place of that sovereignty in our constitutional structure. Our focus

is thus firmly fixed on this specific issue: Did the States cede their sovereignty over discharge matters in bankruptcy as a part of the plan of the Constitutional Convention?

The next step is to review the role of the States in matters relating to the collection and discharge of debt at the time of the Constitutional Convention. This review demonstrates that for the purposes of collecting debt, the States utilized their sovereignty and power to nearly the greatest extent possible, including imprisoning debtors.

The next step is to examine The Federalist Papers, upon which the Supreme Court has often relied in resolving these issues, to determine the contemporaneous understanding of the circumstances in which the States yielded their sovereignty as a part of the formation of the Union. This examination discusses Hamilton's view that the States ceded their sovereignty whenever "a similar authority in the States would be absolutely and totally contradictory and repugnant." THE FEDERALIST NO. 32 at 152-53 (Alexander Hamilton) (Buccaneer Books, 1992). Although Hamilton did not explicitly discuss the application of this standard in the context of bankruptcy, he did conclude that when the States agreed to the naturalization clause, under which Congress was granted the power to enact "uniform" laws on that subject, the States did yield their sovereignty. Two powerful considerations compel the conclusion that the States must also have yielded their sovereignty over bankruptcy matters. First, the drafters of the Constitution utilized the same unique and identical language to empower Congress to enact "uniform" laws on these two subjects. Second, the conclusion that it would be contradictory and repugnant to allow sovereignty to both Congress and the States is as strong in the bankruptcy context as it is in the naturalization context.

The next part of the opinion demonstrates that throughout our history, the Supreme Court's decisions have consistently and repeatedly recognized that the sovereignty of the States is subject to the laws that Congress chooses to enact on bankruptcy matters. That binding precedent from the Supreme Court is inconsistent with the view that States retain their sovereignty in bankruptcy discharge matters.

Finally, the opinion explains that the statements in *Seminole Tribe* on which TSAC relies are dicta, to be accorded little weight in the analysis. The summary treatment given to this issue in the cases since *Seminole Tribe* is also discussed.

B.  Sovereignty Is a Matter of the Plan of the Constitutional Convention.

The analysis of sovereign immunity in bankruptcy begins by examining the plan of the Constitutional Convention.  "Although the sovereign immunity of the States derives at least in part from the common-law tradition, the structure and history of the Constitution make clear that the immunity exists today by constitutional design."  *Alden v. Maine*, 527 U.S. 706, 734, 119 S. Ct. 2240 (1999).  In *Alden*, the Supreme Court observed:

> [T]he States' immunity from suit is a fundamental aspect of the sovereignty which the States enjoyed before the ratification of the Constitution, and which they retain today (either literally or by virtue of their admission into the Union upon an equal footing with the other States) except as altered by the plan of the Convention or certain constitutional Amendments.

*Id*. at 713.

The Supreme Court also stated, "The Eleventh Amendment confirmed rather than established sovereign immunity as a constitutional principle; it follows that the scope of the States' immunity from suit is demarcated not by the text of the Amendment alone but by fundamental postulates implicit in the constitutional design."  *Id*. at 728-29.  *See also Seminole Tribe*, 517 U.S. at 70 n.13.

Alexander Hamilton expressed this guiding principle in The Federalist Papers.  "Unless, therefore, there is a surrender of this immunity in the plan of the convention, it will remain with the states . . . ."  THE FEDERALIST NO. 81, at 414 (Alexander Hamilton) (Buccaneer Books, 1992).  The Supreme Court has firmly embraced the principle that any surrender of sovereignty must be reflected in the plan of the Constitutional Convention.  *See Seminole Tribe*, 517 U.S. at 70 n.13; *Alden*, 527 U.S. at 730.

Accordingly, the precise issue in this appeal is whether, as a part of the plan of the Convention, which granted Congress the authority to enact "uniform" bankruptcy laws, the States ceded to Congress their sovereignty over bankruptcy discharge matters.

C.  Bankruptcy and Debt Collection in Early America.

At the time of the Constitutional Convention, the power and sovereignty of the States were fully engaged in the processes of private debt collection and of discharge from debt.  Indeed, that power was engaged in the most coercive way available to the States.

"Imprisonment for debt was commonplace in the colonies and then in the states, until the mid-nineteenth century." Charles Jordan Tabb, *The History of the Bankruptcy Laws in the United States*, 3 AM. BANKR. INST. L. REV. 5, 12 (1995).

The States' use of imprisonment for private debt collection was brought here from England. "For at least the preceding two centuries, the history of bankruptcy legislation in England was in essence continuous struggle over the power of the king, not only to tax his subjects but also to imprison those who did not pay their debts, and to seize the landholdings of traitors." *Bliemeister v. Industrial Comm'n of Az.* (*In re Bliemeister*), 251 B.R. 383, 390 (Bankr. D. Ariz. 2000), *aff'd on alternate grounds*, Case No. 00-1557-PHX (D. Az. Mar. 28, 2001) (holding that the State had waived sovereign immunity by failing to raise the defense in a timely manner and not reaching the issue whether the State had sovereign immunity in a bankruptcy proceeding). *See also Nelson v. La Crosse County District Attorney* (*In re Nelson*), 254 B.R. 436, 445 (Bankr. W.D. Wis. 2000), *rev'd*, 258 B.R. 374 (W.D. Wis. 2001); Garrard Glenn, *Fraudulent Conveyances and Practices*, Vol. 1, §§ 61-61c (Rev. ed. 1940).

In arguing for the passage of the first bankruptcy law in the United States, Daniel Webster stated, "I am free to confess my leading object to be to relieve those who are at present bankrupt, hopeless bankrupts, and who cannot be discharged *or set free* but by a bankrupt act passed by Congress." Charles Warren, *Bankruptcy in United States History*, 67 (1935) (emphasis added). Webster further observed, "[T]here are many who cannot come here to the seat of Government for fear of arrest by creditors in some intervening State or in the District of Columbia." *Id*. at 67-68. Webster's comments demonstrate how deeply the issue of a discharge from debtors' prison was bound up with state sovereignty.

As *Bliemeister* recently noted:

> In the colonies thousands of debtors were imprisoned, and while several states passed discharge provisions they were constitutionally suspect when applied to nonresident creditors. Indeed, some states had passed private acts to relieve individual debtors, which raised sovereignty questions when applied to creditors from other states and undoubtedly led to the concern for uniformity. Consequently bankruptcy law, and particularly the discharge, was very much an issue involved with states' sovereignty, because it was a limitation on

the power of the sovereign to imprison debtors and punish traitors, or to grant individual relief.

*Bliemeister*, 251 B.R. at 390-91 (internal citations omitted).  Thus, in these times, the States "discharged" debtors by private enactments releasing them from debtors' prison.

D.  The Plan of the Constitutional Convention

This was the historical context that compelled the framers of our Constitution to include the Bankruptcy Clause in Article I.  This clause states, "Congress shall have power . . . To establish . . . uniform Laws on the subjects of Bankruptcies throughout the United States."  U.S. CONST. art. I, § 8, cl. 4.  This historical context also compels the conclusion that the plan of the Convention necessarily included the States' surrendering their sovereignty over bankruptcy.

> For more than a century the broad interpretations of the Eleventh Amendment by the Supreme Court have been rooted in Alexander Hamilton's analysis of the judiciary's Article III powers in The Federalist No. 81[.]  In *Seminole Tribe*[,] the majority cites to The Federalist No. 81 at least three times.  A careful reading of the passage of The Federalist No. 81 reveals that Hamilton directed his readers to his article on Congress's power of taxation, The Federalist No. 32, for a discussion of the limits on state sovereignty imposed by the Constitution.  In Federalist No. 32 Hamilton described state sovereignty as being lost in those areas in which Congress is granted the power to make uniform laws.  Thus, at the inception of the Constitution, it was recognized that bankruptcy law required a subordination of state sovereignty.

Leonard Gerson, *A Bankruptcy Exception to Eleventh Amendment Immunity: Limiting the Seminole Tribe Doctrine*, 74 AM. BANKR. L.J. 1, 11 (2000) (footnotes omitted).

In the first Supreme Court decision addressing the Bankruptcy Clause of the Constitution, *Sturges v. Crowninshield*, 17 U.S. (4 Wheat) 122 (1819), Chief Justice Marshall recognized the importance and uniqueness of the uniformity requirement:

> The peculiar terms of the grant certainly deserve notice.  Congress is not authorized merely to pass laws, the operation of which shall be uniform, but to establish uniform laws on the subject throughout the United States.  This establishment of

uniformity is, perhaps, incompatible with state legislation, on that part of the subject to which the acts of congress may extend.

*Id.* at 193-94.

In *Railway Labor Executives' Ass'n v. Gibbons*, 455 U.S. 457, 102 S. Ct. 1169 (1982), the Supreme Court reviewed in some detail the plan of the Convention as it pertains to this issue:

> The subject of bankruptcy was first introduced [at the Constitutional Convention] on August 29, 1787, by Charles Pinckney during discussion of the Full Faith and Credit Clause. Pinckney proposed the following grant of authority to Congress: "To establish uniform laws upon the subject of bankruptcies, and respecting the damages arising on the protest of foreign bills of exchange." 2 M. Farrand, Records of the Federal Convention of 1787, p. 447 (1911). Two days later, John Rutledge recommended that the following be added to Congress' powers: "To establish uniform laws on the subject of bankruptcies." *Id.*, at 483. The Bankruptcy Clause was adopted on September 3, 1787, with only Roger Sherman of Connecticut voting against. *Id.*, at 489. [n.13]
>
> Prior to the drafting of the Constitution, at least four States followed the practice of passing private Acts to relieve individual debtors. Nadelmann, On the Origin of the Bankruptcy Clause, 1 Am.J.Legal Hist. 215, 221-223 (1957). *Given the sovereign status of the States, questions were raised as to whether one State had to recognize the relief given to a debtor by another State. See Millar v. Hall*, 1 U.S. (1 Dall.) 229, 1 L. Ed. 113 (1788); *James v. Allen*, 1 U.S. (1 Dall.) 188, 1 L. Ed. 93 (1786). Uniformity among state debtor insolvency laws was an impossibility and the practice of passing private bankruptcy laws was subject to abuse if the legislators were less than honest. Thus, it is not surprising that the Bankruptcy Clause was introduced during discussion of the Full Faith and Credit Clause.

455 U.S. at 472.[1] (emphasis added.)  Thus, the Supreme Court recognized that uniformity and state sovereignty are incompatible and that therefore the uniformity requirement in the Bankruptcy Clause was intended to impact state sovereignty in the most direct way.

In the Federalist No. 32, Hamilton describes and gives examples of the three ways state sovereignty is alienated:

> where the Constitution in express terms granted an exclusive authority to the Union; where it granted in one instance an authority to the Union and in another prohibited the States from exercising the like authority; and where it granted an authority to the Union, to which a similar authority in the States would be absolutely and totally contradictory and repugnant. . . .

*Id.* at 388-89 (quoting THE FEDERALIST NO. 32, at 152-53).

Hamilton did not specifically address whether the authority of Congress over bankruptcy matters would conflict with the sovereignty of the States.  Hamilton did, however, conclude that the power of Congress over naturalization was an example of the third way in which state sovereignty is ceded to the federal government.  Article I gives Congress the power "to establish an UNIFORM RULE of naturalization throughout the United States."  Hamilton concluded, "This must necessarily be exclusive; because if each State had power to prescribe a DISTINCT RULE there could be no UNIFORM RULE."  THE FEDERALIST NO. 32, at 152-53 (emphasis in original).

The same clause that grants Congress the authority to make uniform laws on naturalization also provides for uniform laws on bankruptcy.  "Congress shall have power . . . To establish an uniform Rule of Naturalization, and uniform Laws on the subjects of Bankruptcies throughout the United States."  U.S. CONST. art. I, § 8, cl. 4.  The parallel between naturalization and bankruptcy was noted in *Bliemeister*:

> The implication is unmistakable.  The people and the states agreed in the original plan of the convention that if Congress should elect to act on the subject of bankruptcies, the states surrendered their sovereign powers on the subject.  And as

---

1.  Interestingly, footnote 13 in this passage states, "'Mr. Sherman observed that Bankruptcies were in some cases punishable with death by the laws of England--& He did not chuse to grant a power by which that might be done here.'  2 M. Farrand, Records of the Federal Convention of 1787, p. 489 (1911)."  455 U.S. at 472.

> Hamilton indicated, the framers had taken "the most pointed care" to specify the states' surrender of their sovereignty on these very few, carefully selected subjects. The states no more retained sovereign powers over bankruptcy laws than they did over naturalization.

*Bliemeister*, 251 B.R. at 389-90. *See also Nelson*, 254 B.R. at 444.

The Panel agrees that the States ceded their sovereignty over bankruptcy matters at the Constitutional Convention, just as Hamilton concluded that the States ceded their sovereignty over naturalization matters. As noted, Hamilton observed that allowing the States to establish distinct rules regarding naturalization would mean that there would be no uniform rules. That observation would apply with equal force in the context of bankruptcy. Indeed, although it may seem bizarre to contemplate in our modern times, it is nonetheless true that subordinating bankruptcy laws to the sovereignty of the States would permit the States to use their power and sovereignty to collect any debt, including both public and *private* claims. It would thus permit the States to ignore the bankruptcy process, including most importantly the discharge provisions of 11 U.S.C. § 524(a). This is precisely the result that the framers of the Constitution both foresaw and sought to preclude when they empowered Congress to enact "uniform" laws on bankruptcy. "When the states agreed to a uniform federal rule, they had to understand that they were surrendering their sovereignty over the subject of bankruptcies." *Bliemeister*, 251 B.R. at 391. *See also Nelson*, 254 B.R. at 445.

Moreover, the second of Hamilton's grounds upon which the States yielded their sovereignty also applies in the bankruptcy context. Here Hamilton concluded that state sovereignty was yielded when the Constitution grants authority to Congress while explicitly prohibiting that authority to the States. "The bankruptcy clause entails an ability to impair the obligations of contracts, a power which was expressly denied to the States by art. I sect. 10. See *Hanover Nat'l Bank v. Moyses*, 186 U.S. 181, 22 S. Ct. 857 (1902)." *Bliemeister*, 251 B.R. at 389.

A review of the pattern of Supreme Court cases recognizing limits on state sovereignty in bankruptcy also compels this conclusion.

E. Supreme Court Cases Limiting State Sovereignty and Sovereign Immunity in Bankruptcy.

The Supreme Court has consistently and repeatedly held that there are limits on state sovereignty within the bankruptcy context. These cases divide into two lines. The first line of cases explicitly and consistently permits the federal bankruptcy laws to impact the financial position of the state in its role as a creditor. The second line permits the federal bankruptcy laws to impact the sovereignty of the state in its legislative and judicial functions.

### 1. Supreme Court Cases Impacting the State as a Creditor

In *New Jersey v. Anderson*, 203 U.S. 483, 27 S. Ct. 137 (1906), the Supreme Court held that a state court's interpretation that a debt was a tax debt was not binding on the bankruptcy court.

> [A] state court, while entitled to great consideration, cannot conclusively decide that to be a tax within the meaning of a Federal law providing for the payment of taxes, which is not so in fact. The section (64a) itself declares that, in case of disputes as to the amount or legality of any such tax, they shall be heard and determined by the [bankruptcy] court. The state court may construe a statute and define its meaning, but whether its construction creates a tax within the meaning of a Federal statute, giving a preference to taxes, is a Federal question, of ultimate decision in this court.

*Id.,* 203 U.S. at 491-92. If the Supreme Court in *Anderson* had believed that the States had retained their full sovereignty in the bankruptcy context, the Court certainly would have required the bankruptcy court to abide by the state court's determination on the tax issue. Indeed, the Court's determination that the bankruptcy court has the *exclusive* jurisdiction on the state tax issue impacts both the State's role as a creditor and its role as a sovereign exercising its judicial function.

In *New York v. Irving Trust Co.*, 288 U.S. 329, 53 S. Ct. 389 (1933), the State specifically asserted sovereign immunity in response to an objection to the untimeliness of its proof of claim. The State argued that the power of the federal court to disallow its proof of claim is incompatible with state sovereignty. The Supreme Court flatly rejected this argument, stating, "The Federal Constitution clothes the Congress with power to

establish uniform laws on the subject of bankruptcies." *Id*. at 331. The Supreme Court further stated:

> The Federal government possesses supreme power in respect of bankruptcies. If a state desires to participate in the assets of a bankrupt, she must submit to appropriate requirements by the controlling power; otherwise, orderly and expeditious proceedings would be impossible and a fundamental purpose of the Bankruptcy Act would be frustrated.

*Id*. at 333 (internal citation omitted).[2] Thus, the Supreme Court recognized that an orderly and expeditious bankruptcy process necessarily requires subordination of state sovereignty.

The same fundamental principle governed *Gardner v. New Jersey*, 329 U.S. 565, 67 S. Ct. 467 (1947), in which the Supreme Court held that the bankruptcy court has jurisdiction to deal with a state tax lien. The Supreme Court explained that if the bankruptcy court:

> lacked the power to deal with tax liens of a State, the assertion by a State of a lien would pull out chunks of an estate from the reorganization court and transfer a part of the struggle over the corpus into tax bureaus and other state tribunals. That would not only seriously impair the power of the court to administer the estate and adversely affect the power of the Interstate Commerce Commission and the court to promulgate a reorganization plan.

*Id*. at 577. Thus, once again, the Court recognized that the goals of bankruptcy could not be fulfilled if the reorganization court were not permitted to address the State's lien claims against estate property.

The Supreme Court further observed that:

---

2. Another Supreme Court case issued the same year demonstrates that this yielding of state sovereignty is limited. In *Missouri v. Fiske*, 290 U.S. 18, 54 S. Ct. 18 (1933), the Supreme Court refused to allow a private individual to seek relief against a State in federal court due to the State's sovereignty, even when the relief sought was the enforcement of a federal court's prior judgment. "The willingness of the Supreme Court to uphold the jurisdiction of the bankruptcy court in *Irving Trust*, as compared to its refusal to allow for jurisdiction in *Fiske*, reflects the inherently different status accorded a state's Eleventh Amendment immunity in bankruptcy." Gerson, 74 AM. BANKR. L.J. at 5.

> [t]he constitutional authority of Congress to grant the bankruptcy court power to deal with the lien of a State has been settled. In *Van Huffel v. Harkelrode*, 284 U.S. 225 (1931), the Court held that the bankruptcy court was constitutionally empowered to order a sale of property of a bankrupt free and clear of a lien of a State for taxes.

*Gardner*, 329 U.S. at 578.

In *Hoffman v. Connecticut Dep't. of Income Maint.*, 492 U.S. 96, 101, 109 S. Ct. 2818, 2823 (1989), the issue was whether the 1978 Bankruptcy Reform Act abrogated the sovereign immunity of the States in unmistakably clear language. In a plurality opinion, Justice White and three other justices concluded that 11 U.S.C. § 106 was not sufficiently clear. Nevertheless, Justice White stated, "[A] State that files no proof of claim would be bound, like other creditors, by discharge of debts in bankruptcy, including unpaid taxes[.]" *Id.*, 492 U.S. at 102. In this view, a State that seeks to be paid any distribution on its claim as a creditor must file a proof of claim like all other creditors. Four other justices concluded in dissent that the Bankruptcy Code did properly abrogate sovereign immunity. It thus seems likely that these four justices would agree with Justice White's conclusion regarding the States' need to file proofs of claim.

In any event, the issue of the States' need to comply with bankruptcy claims procedures was put to rest in the recent case of *Raleigh v. Illinois Dep't. of Revenue*, 530 U.S. 15, 120 S. Ct.1951 (2000). Importantly, the Supreme Court decided this case after *Seminole Tribe*, *College Savings I*, *College Savings II* and *Alden*. The specific question in *Raleigh* involved the burden of proof on a contested proof of claim filed by the State in bankruptcy court. In the course of its opinion holding that this burden is the same in bankruptcy as it would be outside of bankruptcy, the Court stated, "[F]ederal law has generally evolved to impose the same procedural requirements for claim submission on tax authorities as on other creditors[.]" 530 U.S. at 24. The Court also stated, "[T]ax litigation will be subject to an automatic stay[.]" *Id.* at 25. The significance of this case is that even after *Seminole Tribe* and its progeny, the Court has considered that the States are fully subject to the bankruptcy process, including the claims process and the automatic stay.

<u>2. Supreme Court Cases Impacting the Sovereignty</u>
<u>of the States in their Legislative and Judicial Functions</u>

The Supreme Court has consistently recognized that the Constitutional authority of Congress to enact uniform bankruptcy laws necessarily impacts the sovereignty of the States in their legislative and judicial functions. This principle was summarized in *Stellwagen v. Clum*, 245 U.S. 605, 613, 38 S. Ct. 215 (1918):

> The federal Constitution, article I, section 8 gives Congress the power to establish uniform laws on the subject of bankruptcy throughout the United States. In view of this grant of authority to the Congress it has been settled from an early date that state laws to the extent that they conflict with the laws of Congress, enacted under its constitutional authority, on the subject of bankruptcies are suspended. . . . *Sturges v. Crowninshield*, 17 U.S. (4 Wheat.) 122, 4 L. Ed. 529; *Ogden v. Saunders*, 25 U.S. (12 Wheat.) 213, 6 L. Ed. 606.

In *Stellwagen*, the Court held that under § 70e of the Bankruptcy Act (repealed), a bankruptcy trustee could utilize a state law permitting recovery of fraudulent conveyances, because the state law did not conflict with federal bankruptcy laws.

On the other hand, in *Perez v. Campbell*, 402 U.S. 637, 91 S. Ct. 1704 (1971), the Supreme Court held that a state law under which the State suspended a debtor's driver's license pending satisfaction of outstanding motor vehicle accident judgments did conflict with the federal bankruptcy discharge, and was thus unconstitutional. The sovereignty of the State to enact laws must yield to the bankruptcy discharge provisions enacted by Congress pursuant to its bankruptcy powers under the Constitution.

In *Butner v. United States,* 440 U.S. 48, 99 S. Ct. 914 (1979), the issue was whether a creditor's security interest extended to postpetition rents. The Supreme Court stated, "Congress has generally left the determination of property rights in the assets of a bankrupt's estate to state law." *Id.*, 440 U.S. at 54. However, the Court emphasized:

> The constitutional authority of Congress to establish "uniform Laws on the subject of Bankruptcies throughout the United States" would clearly encompass a federal statute defining the mortgagee's interest in the rents and profits earned by property in a bankrupt estate. But Congress has not chosen to exercise its power to fashion any such rule.

*Id.* Significantly, Congress has now chosen to exercise its power to define the mortgagee's interest in the rents. *See* 11 U.S.C. § 552(b)(2).

Two recent decisions regarding restitution obligations also demonstrate the point. In *Kelly v. Robinson*, 479 U.S. 36, 107 S. Ct. 353 (1986), the Supreme Court held that under the provisions applicable in Chapter 7, a restitution obligation in a criminal sentence is not dischargeable. 11 U.S.C. § 523(a)(7). On other hand, in *Pennsylvania Dep't. of Public Welfare v. Davenport*, 495 U.S. 552, 110 S. Ct. 2126 (1990), *superceded by statute*, the Supreme Court held that under the provisions of Chapter 13, the State's criminal restitution claim is a debt and is thus dischargeable. 11 U.S.C. § 101(12). Although the results of these cases differed, they did so because the applicable provisions of federal bankruptcy law differed. The Supreme Court did not permit the sovereign interest of the State in its criminal justice system to be a controlling or superior interest. Again, it is significant that Congress has since chosen to reverse the decision in *Davenport*. *See* 11 U.S.C. § 1328(a)(3).

Many other cases illustrate the principle. *See Brown v. Felsen*, 442 U.S. 127, 99 S. Ct. 2205 (1979) (A state court fraud judgment is not entitled to *res judicata* effect in bankruptcy court.); *Midlantic Nat'l Bank V. New Jersey Dep't. of Envtl. Protection*, 474 U.S. 494, 106 S. Ct. 755 (1986) (The state's objection to the trustee's motion to abandon contaminated property should be sustained not because the State was immune to the bankruptcy process, but because the trustee remained subject to applicable environmental regulations.); *Farrey v. Sanderfoot*, 500 U.S. 291, 111 S. Ct. 1825 (1991) (The creditor's state judicial lien was not avoidable under 11 U.S.C. § 522(f), but not because of any considerations of state sovereignty.); *Owen v. Owen*, 500 U.S. 305, 111 S. Ct. 1833 (1991) (In this case, the creditor's state judicial lien was avoidable under 11 U.S.C. § 522(f).).

In *Railway Labor Executives' Ass'n v. Gibbons*, the Supreme Court put this exclamation point on the issue, "The Framers sought to provide Congress with the power to enact uniform laws on the subject *enforceable among the States*." 455 U.S. at 472. (emphasis added) (citation omitted). Similarly, in *International Shoe Co. v. Pinkus*, 278 U.S. 261, 265, 49 S. Ct. 108 (1929), the Supreme Court stated, "The national purpose to establish uniformity necessarily excludes state regulation. . . . States may not pass or enforce laws to interfere with or complement the Bankruptcy Act or to provide additional

or auxiliary regulations." (citing *Prigg v. Pennsylvania*, 41 U.S. (16 Pet.) 539, 617, 618, 10 L. Ed. 1060 (1842); *Northern Pac. Ry. v. Washington*, 222 U.S. 370, 378, 32 S. Ct. 160 (1912); *St. Louis, Iron Mt. & S. Ry. v. Edwards*, 227 U.S. 265, 33 S. Ct. 262 (1913); *Erie R.R. Co. v. New York*, 233 U.S. 671, 681, 34 S. Ct. 756 (1914); *New York Central R.R. Co. v. Winfield*, 244 U.S. 147, 37 S. Ct. 546 (1917); *Erie R.R. Co. v. Winfield*, 244 U.S. 170, 37 S. Ct. 556 (1917); *Oregon-Washington Co. v. Washington*, 270 U. S. 87, 101, 46 S. Ct. 279 (1926).)

These decisions, impacting the States both as creditors and as sovereigns, demonstrate the Supreme Court's longstanding conclusion that state sovereignty is ultimately inconsistent with the authority of Congress to establish uniform laws on bankruptcy.

F. *Seminole Tribe* and its Progeny in the Supreme Court.

In *Seminole Tribe*, the Supreme Court specifically held that the Eleventh Amendment prevented Congress from abrogating the sovereign immunity of a State pursuant to the Indian Commerce Clause. The Supreme Court reasoned "that the Eleventh Amendment reflects the fundamental principle of sovereign immunity [that] limits the grant of judicial authority in art. III[.]" *Seminole Tribe*, 517 U.S. at 64 (internal quotation marks and citation omitted, alteration in original). The Court concluded "that the background principle of state sovereign immunity embodied in the Eleventh Amendment is not so ephemeral as to dissipate when the subject of the suit is an area, like the regulation of Indian commerce, that is under the exclusive control of the Federal Government." *Id.* at 72.

The Panel concludes that although it must remain faithful to the Court's constitutional analysis in *Seminole Tribe*, nothing in the Court's narrow holding of that case, relating to the issue of state sovereignty in the Indian Commerce context, precludes our holding here.

TSAC, however, relies on language in *Seminole Tribe* that goes beyond the issue of state sovereignty in the Indian Commerce context. In dicta, the Court broadly stated, "The Eleventh Amendment restricts the judicial power under Article III, and Article I cannot be used to circumvent the constitutional limitations placed upon federal jurisdiction." *Id*. at 72-73. In addition, in its response to Justice Stevens' dissenting opinion questioning the

impact of this dicta on other Article I powers, including bankruptcy, *Id.* at 77, (Stevens, J., dissenting), the majority stated:

> Justice STEVENS understands our opinion to prohibit federal jurisdiction over suits to enforce the bankruptcy, copyright, and antitrust laws against the States. He notes that federal jurisdiction over those statutory schemes is exclusive, and therefore, concludes that there is "no remedy" for state violations of those federal statutes. Post, at 1134, n.1. That conclusion is exaggerated both in its substance and in its significance. First, Justice STEVENS' statement is misleadingly overbroad. We have already seen that *several avenues remain open for ensuring state compliance with federal law*. See n.14, supra. . . . Second, contrary to the implication of Justice STEVENS' conclusion, *it has not been widely thought that the federal antitrust, bankruptcy, or copyright statutes abrogated the States' sovereign immunity.* This Court has never awarded relief against a State under any of those statutory schemes[.] . . . Although the copyright and bankruptcy laws have existed practically since our Nation's inception, and the antitrust laws have been in force for over a century, *there is no established tradition in lower federal courts of allowing enforcement of those federal statutes against the States.*

*Seminole Tribe*, 517 U.S. at 72 n.16. (emphasis added.)

This summary treatment of the potential impact of subordinating bankruptcy laws to the sovereignty of the States demonstrates that the *Seminole Tribe* majority did not fully consider the issue. Indeed, the review of the cases in Part E. above fully disproves the majority's twin statements: (1) that it has not been widely thought that bankruptcy statutes abrogated the States' sovereign immunity and (2) that there is no established tradition of allowing enforcement of bankruptcy against the states. *See, e.g., Anderson*, *Irving Trust*, *Gardner*, *Perez*, *Davenport*, *Raleigh* and *Hoffman*. In each of these cases, it was assumed or stated that applicable federal bankruptcy law abrogated the States' sovereign immunity and in several of these cases, the Court fully enforced the bankruptcy process against the State involved. Thus, contrary to the dicta in *Seminole Tribe* quoted above, these cases clearly demonstrate the Supreme Court's historical recognition that the States' sovereignty is limited in the area of bankruptcy.

Moreover, the alternative processes that *Seminole Tribe* offered to vindicate important federal bankruptcy rights and remedies are unrealistic in the bankruptcy context. Specifically, in footnote 14, the Supreme Court offered the following three alternatives:

> The Federal Government can bring suit in federal court against a State, *see, e.g.*, *United States v. Texas*, 143 U.S. 621, 644-645, 12 S. Ct. 488, 493 (1892) (finding such power necessary to the "permanence of the Union"); an individual can bring suit against a state officer in order to ensure that the officer's conduct is in compliance with federal law, *see, e.g., Ex parte Young*, 209 U.S. 123, 28 S. Ct. 441 (1908); and this Court is empowered to review a question of federal law arising from a state-court decision where a State has consented to suit, s*ee, e.g., Cohens v. Virginia*, 19 U.S. (6 Wheat.) 264, 5 L. Ed. 257 (1821).

*Id.,* 517 U.S. at 71 n.14.

Unfortunately, in this footnote the Court did not have the opportunity to examine carefully whether such processes are indeed feasible in the context of the modern bankruptcy reality. Whatever the legal and practical feasibility of these processes in other contexts, it simply cannot be concluded that such alternative processes can succeed in vindicating important federal bankruptcy rights against the States, for three reasons. First, the sheer volume of such matters would be overwhelming in any process. In calendar year 2000, there were 1,253,444 bankruptcy cases filed. U.S. Bankruptcy Filings 1980-2000, American Bankruptcy Institute, *available at* http://www.abiworld.org/stats/1980annual.html (April 26, 2001). In the ten years from 1991 through 2000, there were 11,148,294 bankruptcy cases filed. *Id.* Although not quantified in government statistics, it is likely that a majority of these cases involved claims either against a State or involved the property interests of a State.

Second, each alternative would face substantial legal obstacles. *See* Laura B. Bartell, *Getting to Waiver--a Legislative Solution to State Sovereign Immunity in Bankruptcy after Seminole Tribe*, 17 BANKR. DEV. J. 17, 45-54 (2000).

Third, these alternatives almost certainly could not be carried out in a manner that would be consistent with the policies underlying modern bankruptcy law. These include:

The debtor's fresh start. *See Grogan v. Garner*, 498 U.S. 279, 282, 111 S. Ct. 654 (1991) (The purpose of the federal bankruptcy law is to give a debtor "a new opportunity

in life and a clear field for future effort, unhampered by the pressure and discouragement of pre-existing debt." citing *Local Loan Co. v. Hunt*, 292 U.S. 234, 244, 54 S. Ct. 695 (1934)); *Stellwagen v. Clum*, 245 U.S. at 617; *Williams v. U.S. Fid. & Guar. Co.*, 236 U.S. 549, 554-55, 35 S. Ct. 289 (1915) (The purpose of the federal bankruptcy law is to "relieve the honest debtor from the weight of oppressive indebtedness, and permit him to start afresh free from the obligations and responsibilities consequent upon business misfortunes.").

Maximum and equitable distribution to creditors. *See BFP v. Resolution Trust Corp.*, 511 U.S. 531, 563, 114 S. Ct. 1757 (1994); *Young v. Higbee Co.*, 324 U.S. 204, 210, 65 S. Ct. 594 (1945) ("[H]istorically one of the prime purposes of the bankruptcy law has been to bring about a ratable distribution among creditors of a bankrupt's assets; to protect the creditors from one another."); *Sampsell v. Imperial Paper Corp.*, 313 U.S. 215, 219, 61 S. Ct. 904 (1941). *See also* H.R. REP. NO. 103-835, at 33 (1994), reprinted in 1994 U.S.C.C.A.N. 3340, 3341 (The Code is intended "to enforce a distribution of the debtor's assets in an orderly manner in which the claims of all creditors are considered fairly, in accordance with established principles rather than on the basis of the inside influence or economic leverage of a particular creditor.").

Therefore, the Panel concludes that although the decision in *Seminole Tribe* establishes the analytical framework to be applied in this appeal, its dicta about the application of that framework in the bankruptcy context is entitled to little weight in this appeal. *See Colgrove v. Battin*, 413 U.S. 149, 158, 93 S. Ct. 2448, 2453 (1973) ("We cannot, therefore, accord the unsupported dicta of these earlier decisions the authority of decided precedents."). *See also Central Green Co. v. United States*, 531 U.S. 425, 121 S. Ct. 1005, 1009 (2001); *U.S. Bancorp Mortgage Co. v. Bonner Mall Partnership*, 513 U.S. 18, 24, 115 S. Ct. 386 (1994); *Humphrey's Ex'r v. United States*, 295 U.S. 602, 627, 55 S. Ct. 869 (1935) (Dicta "may be followed if sufficiently persuasive" but are not binding.); *Cohens v. Virginia*, 19 U.S. (6 Wheat) 264, 399-400 (1821).[3]

_____

3. In *Cohens*, the Supreme Court stated:

> It is a maxim, not to be disregarded, that general expressions, in every opinion, are to be taken in connection with the case in which those expressions are used. If they go beyond the case,

After *Seminole Tribe*, the Supreme Court issued five more decisions applying the doctrine that Congress cannot abrogate state sovereignty in the circumstances of the specific Article I powers at issue in those cases. *See Board of Trustees of the Univ. of Al. v. Garrett*, 531 U.S. 356, 121 S. Ct. 955, 962 (2001) (Congress does not have the authority to abrogate state sovereignty under the Americans with Disabilities Act.); *Kimel v. Florida Bd. of Regents*, 528 U.S. 62, 120 S. Ct. 631 (2000) (The Age Discrimination in Employment Act does not provide Congress with the authority to abrogate state sovereignty.); *Alden v. Maine*, 527 U.S. 706, 730-33, 119 S. Ct. 2240 (1999) (Congress cannot abrogate state sovereignty in the Fair Labor Standards Act.); *Florida Prepaid Postsecondary Educ. Exp. Bd. v. College Sav. Bank* (II), 527 U.S. 627, 636, 119 S. Ct. 2199 (1999) (Congress does not have authority to abrogate state sovereignty pursuant to either the Commerce Clause or Patent Clause.); *College Sav. Bank v. Florida Prepaid Postsecondary Educ. Exp. Bd.* (I), 527 U.S. 666, 672 (1999) (The Trademark Remedy Clarification Act does not provide Congress with authority to abrogate state sovereignty.).

For two significant reasons, the Panel concludes that none of these decisions compels a conclusion that the federal bankruptcy process is likewise subject to the sovereignty of the States. First, none of these cases arose in the bankruptcy context. Second, the laws under review in those cases were enacted pursuant to clauses in the Constitution that do not have a uniformity qualification similar to the uniformity qualification for bankruptcy and naturalization laws.

G.  The Progeny of *Seminole Tribe*.

---

they may be respected, but ought not to control the judgment in a subsequent suit, when the very point is presented for decision.  The reason of this maxim is obvious.  The question actually before the court is investigated with care, and considered in its full extent.  Other principles which may serve to illustrate it, are considered in their relation to the case decided, but their possible bearing on all other cases is seldom completely investigated.

*Cohens*, 19 U.S. at 399-400.

In *Schlossberg v. Maryland* (*In re Creative Goldsmiths Of Washington, D.C., Inc.*), 119 F.3d 1140 (4th Cir. 1997), the Court of Appeals relied on the broad dicta in *Seminole Tribe* in holding that the State is immune from suit on a preference action. In refusing to find any distinction between the bankruptcy power and the other powers in Article I, the Fourth Circuit relied heavily on this statement by Justice Marshall in his dissent in *Hoffman*, "I see no reason to treat Congress' power under the Bankruptcy Clause any differently [than the Commerce Clause power, as addressed in *Pennsylvania v. Union Gas Co.*, 491 U.S. 1, 109 S. Ct. 2273 (1989)], for both constitutional provisions give Congress plenary power over national economic activity." *Hoffman*, 492 U.S. at 111 (Marshall, J., dissenting).

The Fourth Circuit's reliance on this statement is misplaced. First, the comment must be understood in the context in which it was made. In *Union Gas*, the Supreme Court had determined that Congress did have the authority under the Interstate Commerce Clause to abrogate state sovereign immunity. Accordingly, Justice Marshall's comment advocated that Congress also had the power to abrogate state sovereign immunity under the Bankruptcy Clause.

> Marshall was arguing that nothing in the Bankruptcy Clause imposes a greater limit on the power of Congress than the Court in *Union Gas* had found to exist under the Interstate Commerce Clause. Justice Marshall had no reason to consider whether the Bankruptcy Clause might confer a broader power on Congress than had been granted under the Interstate Commerce Clause; this issue only arose after the Supreme Court later overruled its decision in *Union Gas* in *Seminole Tribe*.

Gerson, 74 AM. BANKR. L.J. at 13.

Second, neither Justice Marshall in his dissent in *Hoffman* nor the Fourth Circuit in *Creative Goldsmiths* looked at the plan of the Convention to determine if the States had ceded their sovereignty over bankruptcy, as required by *Seminole Tribe* and progeny.

Moreover, *Schlossberg* has been undermined by two subsequent Fourth Circuit decisions that do recognize the necessity of subordinating state sovereignty in bankruptcy. In *Maryland v. Antonelli Creditors' Liquidating Trust*, 123 F.3d 777 (4th Cir. 1997), the court held that the State was not immune from the enforcement of the debtor's confirmed

chapter 11 plan, because, "the power of the bankruptcy court to enter an order confirming a plan . . . derives not from jurisdiction over the state or other creditors, but rather from jurisdiction over debtors and their estates." *Id*. at 787.

Similarly, in *Virginia v. Collins* (*In re Collins*) 173 F.3d 924 (4th Cir. 1999), the court addressed the very issue raised in the present appeal and held that the State is not immune to the bankruptcy court's jurisdiction over a dispute concerning the dischargeability of a debt. The court relied upon *Antonelli* and observed:

> The power of bankruptcy courts to discharge debt is fundamental to our bankruptcy system. If a state could assert Eleventh Amendment immunity to avoid the effect of a discharge order, the bankruptcy system would be seriously undermined. A person owing debts to a state could never have those debts discharged by a bankruptcy court unless the state agreed. Debtors owing money to states could not be assured of the opportunity for a "fresh start" heretofore guaranteed by the bankruptcy laws. As the Supreme Court has said, the purpose of the bankruptcy laws is to "give[ ] to the honest but unfortunate debtor . . . a new opportunity in life and a clear field for future effort, unhampered by the pressure and discouragement of pre-existing debt." *Local Loan Co. v. Hunt*, 292 U.S. 234, 244, 54 S. Ct. 695, 78 L. Ed. 1230 (1934). This purpose can be fulfilled today only if the bankruptcy courts retain the power to discharge debts, including debts owed to states, consistent with established federal supremacy with respect to bankruptcy.

*Id.* at 930 (alteration in original) (citation omitted).

Three other decisions by courts of appeals deserve attention. In *Sacred Heart Hosp. of Norristown v. Pennsylvania, Dep't of Public Welfare* (*In re Sacred Heart Hosp. of Norristown*), 133 F.3d 237 (3d Cir. 1998), and in *Department of Transp. & Dev. v. PNL Asset Mgmt. Co. LLC* (*In re Fernandez*), 123 F.3d 241 (5th Cir. 1997), the courts summarily rejected the argument that the uniformity requirement in the Bankruptcy Clause of the Constitution compelled a different conclusion than the conclusion reached by *Seminole Tribe* and its progeny in other Article I contexts. For example, in *Sacred Heart*, the court stated, "there is simply no principled basis to distinguish the Bankruptcy Clause from other Article I clauses." 133 F.3d at 243.

In so holding, the courts in *Sacred Heart* and *Fernandez* relied, in substantial part, on this one sentence in a concurring opinion by Justice Frankfurter in *Vanston Bondholders Protective Comm. v. Green*, 329 U.S. 156, 172, 67 S. Ct. 237, 244 (1946), "The Constitutional requirement of uniformity is a requirement of geographic uniformity."[4]  *Id.* (Frankfurter, J., concurring).  However, only two other justices joined Justice Frankfurter and the majority rejected so simple a view of the uniformity requirement.  In that case, the issue was whether the federal bankruptcy court should allow interest on interest on a claim. A test based on geographic uniformity would have examined and applied state law. Instead, the Court stated, "In determining what claims are allowable and how a debtor's assets shall be distributed, a bankruptcy court does not apply the law of the state where it sits."  329 U.S. at 162.  Further, "[w]hen and under what circumstances federal courts will allow interest on claims against debtors' estates being administered by them has long been decided by federal law."  *Id.* at 163.  The Court ultimately concluded that allowing such interest on interest "would not be in accord with the equitable principles governing bankruptcy distributions."  *Id.*

The third appellate court case applying *Seminole Tribe* in the bankruptcy context is *Mitchell v. Franchise Tax Bd*. (*In re Mitchell*), 209 F.3d 1111, 1119 (9th Cir. 2000).  In that case, the court limited its discussion to this statement: "In short, there is no policy-based exception - such as national uniformity - to the *Seminole Tribe* rule that Congress may not abrogate state immunity from suit under Article I."  *Id*.  In so ruling, the Court relied only on the broad dicta in *Seminole Tribe*, without further analysis.

Finally, it must be observed that the district court opinion in *In re Nelson*, 258 B.R. 374 (W.D. Wis. 2001), reversing the bankruptcy court's decision, treats the issue as summarily as *Mitchell*.  The court's two sentence analysis simply states, "Both the Indian Commerce Clause and the Bankruptcy Clause are found in Article I of the Constitution. The holding of *Seminole* provides that the Bankruptcy Clause in Article I cannot be used

---

4.    Significantly, Justice Frankfurter also stated, "Bankruptcy legislation is superimposed upon rights and obligations created by the laws of the States."  329 U.S. at 171. (Frankfurter, J., concurring).

to circumvent the Eleventh Amendment restriction of suits by private parties against states." *Id.* at 376.[5]

These opinions are not binding on the Panel and the Panel finds the analysis in them unpersuasive.  Accordingly, the Panel accords them no weight.

## V.  CONCLUSION

The States ceded their sovereignty over the bankruptcy discharge as a part of the plan of the Constitutional Convention.  Where there is no sovereignty, there can be no sovereign immunity.  Accordingly, TSAC is not immune in this dischargeability action and the order of the bankruptcy court denying TSAC's motion to dismiss is **AFFIRMED**.

---

5.  In the recent case of *Arecibo Cmty. Health Care, Inc. v. Puerto Rico*, 244 F.3d 241 (1st Cir. 2001), the First Circuit joined the other courts that have given summary treatment to this issue: "We can see no principled reason to distinguish the legislation in this case, or to sustain its constitutionality, in the face of the Supreme Court's recent decision regarding sovereign immunity."  *Id.* at 245 *(citing College Sav. Bank*, 527 U.S. 666).

A further problem with *Arecibo* is that it allows Puerto Rico to assert sovereign immunity even though both its proof of claim in the bankruptcy case and the adversary proceeding filed against it were based on the same contract.  Thus, this decision directly contravenes *Gardner*, 329 U.S. 565, which the Supreme Court reaffirmed in *College Sav. Bank*, 527 U.S. at 681 n.3 (*Gardner* "stands for the unremarkable proposition that a State waives its sovereign immunity by voluntarily invoking the jurisdiction of the federal court.").